In re John Henry PATCH, IV, Debtor.

BIALEK'S MEDICAL ARTS CLINICAL REFERENCE LABORATORY, INC., Samuel M. Bialek, Ted Bialek, Plaintiffs,

v.

John Henry PATCH, IV, Defendant.

Bankruptcy No. 80–1–1368.
Adv. No. 81–0083.

United States Bankruptcy Court,
D. Maryland,
at Rockville.

Sept. 15, 1982.

Richmond T. P. Davis, Silver Spring, Md., for debtor/defendant.

James E. Hirschman, Leonard Goldstein, College Park, Md., for plaintiffs.

Gilbert Sussman, Silver Spring, Md., trustee in bankruptcy of John Henry Patch.

## MEMORANDUM OPINION

PAUL MANNES, Bankruptcy Judge.

This matter is before the court upon a four count complaint filed by Bialek's Medical Arts Clinical Reference Laboratory, Inc. (BMA), Samuel M. Bialek and Ted Bialek (plaintiffs) against John Henry Patch IV (defendant). Plaintiffs seek to except from discharge certain debts due them as a result of the sale of a medical laboratory located at 1145—19th Street, N.W., Washington, D.C. by BMA to Patch and a guaranty executed by Patch in connection therewith. The court finds that it was not reasonable for plaintiffs to rely upon the oral misstatements made by defendant regarding his financial condition and therefore, the debt should be discharged pursuant to 11 U.S.C. Section 523.

Plaintiffs' principal witness, Samuel M. Bialek, is a pharmacist and community leader within the metropolitan Washington area. He, together with his brother, are the principals in various enterprises. Prior to January 1978, they operated, among other things, a clinical laboratory located in an office building on 19th Street. This laboratory is in the heart of downtown Washington. The building has over 100 medical offices within it and there are more than 600 medical offices within close proximity. Furthermore, Dr. Samuel M. Bialek is an experienced and capable businessman.

Towards the end of 1980, Dr. Bialek decided to upgrade the personnel at the 19th Street laboratory. To that end, he interviewed several individuals with a view towards hiring a chief executive officer of the laboratory. He settled upon Dr. Patch, whose references and resume he had checked thoroughly. In addition, Dr. Bialek made some independent investigations at the National Institutes of Health located in Bethesda, Maryland. As a result of these procedures, Dr. Bialek was satisfied that Dr. Patch was of the high quality that he felt he would be confident with, particularly since his association with the laboratory was well known. Dr. Patch went to work for Dr. Bialek on or about January 30, 1978, and, in the words of Dr. Bialek, Dr. Patch became a trusted employee and they developed a close relationship. He referred to himself as a pseudo-father for Dr. Patch and spent considerable time in discussions with him of both a business and a non-business nature.

Some time in June of 1978, Dr. Bialek and his brother considered divesture of the laboratory. There were many potential purchasers for this productive laboratory, but when Dr. Patch learned of the availability of the laboratory, discussions then took place among them which resulted in the parties entering into a sales agreement that was consummated on August 1, 1978. Under the terms of the agreement, the assets of the medical laboratory were sold to a corporation known as Professional Health Services, Ltd. (P.H.S.). Part of the consideration was paid in cash and part in the form of a deferred purchase money note. The notes of P.H.S. were guaranteed by Dr.

Patch and these other individuals who were active in the business with him.

Dr. Bialek testified that he looked to the assets of Dr. Patch and not to the other individuals as security for the undertaking. The question of security was important to him because he and his brother had continuing obligations upon the lease for the property, and if he were not satisfied as to the financial responsibility of the purchaser, he would have required substantial escrows and a larger cash down payment.

The applicable section of the Bankruptcy Code is 11 U.S.C. Section 523(a)(2)(A). That section provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\*    \*    \*    \*    \*    \*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

In order to recover under 523(a)(2)(A), the false pretense, etc. must relate to something *other* than debtor's financial condition. See, *In Re Adair,* 17 B.R. 456 (Bkrtcy. N.D. Ga. 1980).

Obviously, the alleged net worth of Dr. Patch related to his financial condition. Plaintiffs looked to Dr. Patch's assets for security, but the Bankruptcy Code does not permit recovery for this kind of alleged misrepresentation.

Dr. Bialek testified that he relied upon Dr. Patch's representations made orally that he had a half million dollars to call upon by virtue of an interest in a trust. While there was discussion of a written financial statement that was handed around at the time of settlement of the sales agreement on August 1, 1978, there was no satisfactory description of the statement and no evidence that plaintiffs reasonably relied upon it in going forward. The financial statement admitted into evidence as plaintiffs' Exhibit # 2, was not seen by plaintiffs prior to settlement, and, therefore, there is no statement in writing upon which plaintiffs relied to serve as the basis for an exception to discharge under Section 523(a)(2)(B).[1] Plaintiffs failed to establish an oral false pretense about anything other than defendant's financial condition, and there is no evidence as to any statement in writing upon which plaintiffs reasonably relied.

The defendant is a very confused young man with serious problems, some of which are discussed in his father's letter of March 25, 1981. The court finds that he did state irresponsibly that he had a half million dollars to call upon and that he told this to Dr. Bialek. However, it is perfectly clear that Dr. Patch did not understand the first thing about the trust, and that the trust was a revocable trust controlled by his father. Since the elder Patch disapproved of much of the activities of the younger Patch, there was no likelihood that the latter would gain control of the trust. The court finds as a fact that Dr. Patch thought that he was a wealthy man based upon the practice of his father of giving money from time to time when and as the son needed it for various purposes, including the payment of medical bills, the payment of educational expenses after his divorce, and the payment of various sums when the son experienced physical difficulties. This is what Dr. Patch had in mind when he advised Dr. Bialek from time to time that he had access to funds. He

1. Section 523(a)(2)(B) provides in pertinent part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by

\*    \*    \*    \*    \*    \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive

believed that he had such funds to call upon until the time his father advised him that he had no such control. The representations by Dr. Patch, some of which preceded the serious negotiations for the sale of the business, were true as far as he understood and, therefore, did not amount to actual fraud or a false representation or a false pretense. The access that he had to the funds was through his father. Had his father gone along with the program and continued to underwrite his son's activities, perhaps this case would not have arisen. For whatever reason, the senior Patch chose not to bail out his son on this occasion. The court finds no intent to deceive on the part of Dr. Patch. It was simply a case of careless statements made by an individual whose knowledge of business was said by all to be slight.

The court does not find that there was any fiduciary relationship between Dr. Patch and Dr. Bialek insofar as the transfer of the business was concerned. Dr. Bialek was interested in obtaining a reasonable price for the business together with reasonable security. If he relied upon his close relationship with Dr. Patch, then he did not rely upon any representation of Dr. Patch. If he intended to look to Dr. Patch's personal wealth as the security for the undertaking, then he failed to use any reasonable means to verify what for him was the keystone of a transaction. One letter or one telephone call could have settled the matter. He went to far greater lengths to check out Dr. Patch's professional ability at the time that he hired him. There was not the moral turpitude or intentional wrong to stand as the basis for relief here. See *In re Green*, 5 B.R. 247, 2 C.B.C.2d 905 (Bkrtcy. N.D. Ga. 1980); *In re Archangeli*, 6 B.R. 50, 2 C.B.C.2d 1209 (Bkrtcy. Me. 1980).

Fraud or dishonesty must be proven by clear and convincing evidence. *In re Huff*, 1 C.B.C.2d 171 (B. Utah 1979). Here there were some irresponsible and almost ridiculous statements of a confused young man, which while thought by him to be true, should not and did not form the basis for a reasonable business judgment in assuming this business risk. An order will be entered dismissing the complaint.