In re: Lawrence Augustus LIPSCOMB, III and Cecelia Mae Barnes Lipscomb, Debtors.

BORG-WARNER ACCEPTANCE CORPORATION, Plaintiff,

v.

Lawrence Augustus LIPSCOMB, III, Defendant.

Bankruptcy No. 83–00641–R.
Adv. No. 83–01067–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

May 29, 1984.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court upon the filing by Borg-Warner Acceptance Corporation (Borg-Warner) of a complaint to determine the dischargeability of a debt owed to Borg-Warner by the debtor, Lawrence Augustus Lipscomb, III. This Court held a trial on the plaintiff's complaint on January 19, 1984. During the trial the defendant moved to strike the plaintiff's evidence, that motion as well as the plaintiff's complaint was taken under advisement. After the submission of memoranda in support of their positions and after consideration thereof, this Court renders the following findings of fact and conclusions of law.

## STATEMENT OF FACTS

The debtor was involved with the management of Lipscomb Brothers Lumber Company, Inc. (the "business" or "corporation") from 1963 to the present. During the years 1963 through 1973 the business was run in partnership form, the principal partners being the debtor's father, Lawrence Augustus Lipscomb, Jr. and the debtor's uncle. The business was incorporated in 1973 and the debtor served as president of the corporation from that time to the present.

Prior to January 1981 the debtor, on behalf of the corporation, entered into a line of credit loan agreement with Bank of Virginia. The line of credit was approximately $1,000,000, $400,000 of which was secured by a first lien against the business's inventory and accounts receivable and approximately $600,000 of which was secured by a first lien on the business property of Lipscomb Brothers Lumber Company, Inc. and a second lien on certain apartment buildings.

In January of 1981, Borg-Warner made a business call on the debtor for purposes of investigating the possibility of extending credit to the debtor and the debtor's busi-

Samuel M. Walker, Jr., Richmond, Va., for plaintiff.

George W.R. Glass, Richmond, Va., for defendant.

ness. In April 1981, the debtor requested of Borg-Warner a $700,000 line of credit. On April 9, 1981, Borg-Warner and the debtor on behalf of the lumber company entered into a credit arrangement and security agreement with addendum. The addendum specifically modified the line of credit under the agreement from $700,000 to $200,000. The addendum to the credit arrangement specifically reserved to Borg-Warner, the right to increase the line of credit to $700,000 if certain conditions were satisfied, one of which was, that Borg-Warner acquire a first lien on the debtor's inventory and accounts receivable. Collateral for the initial $200,000 line of credit was a second lien on the business inventory and accounts receivable, a first deed of trust on 155 acres in Hanover County, Virginia, an assignment of life insurance, and the personal guarantee of the debtor and his wife. Prior to January 25, 1982 this initial line of credit actually reached $228,-000 as a result of Borg-Warner making certain interest payments to the Bank of Virginia on behalf of the debtor's business and after request by the debtor.

In November of 1981, representatives of Borg-Warner went with the debtor to the Bank of Virginia and had a meeting with officials at the Bank of Virginia regarding the corporation's financial condition and status of the line of credit with the Bank of Virginia. The Bank of Virginia expressed concern about the line of credit, expressed a desire to get out of the inventory loan with the corporation, and told the debtor that the collateral securing the line of credit would be liquidated if the corporation could not make the required payments.

At this time the debtor requested that Borg-Warner increase the corporation's line of credit with Borg-Warner from $200,000 to $900,000. As security for this new line of credit, the debtor offered to Borg-Warner a first deed of trust on the debtor's residence, a first deed of trust on an apartment building, a second deed of trust on another apartment building, a first deed of trust on some other real property, a life insurance assignment, a second deed of trust on the business property, new personal guarantees from the debtor and his wife, and in addition, personal guarantees from the debtor's father and mother, Mr. and Mrs. Lawrence A. Lipscomb, Jr.

In considering the debtor's application for an extended line of credit to $900,000 representatives of Borg-Warner were supplied with statements of the debtor's father's financial condition on two different occasions. Financial statements given to Borg-Warner in April of 1981 and an updated one in September of 1981 demonstrated that the debtor's father had a net worth of between $2 million and $2.5 million. Representatives of Borg-Warner testified that Lawrence A. Lipscomb, Jr.'s wealth was in very liquid assets. In addition to the personal guarantee of Lawrence A. Lipscomb, Jr., Borg-Warner believed that the debtor's father would help oversee the successful operation of the lumber business and that the personal guarantee would be a sign of confidence in his son, both of which Borg-Warner considered important in determining whether to grant to the debtor and the business the $900,000 line of credit.

On January 25, 1982, the $900,000 line of credit was closed. At the closing of this new line of credit, $100,000 of the loan proceeds were given to the Bank of Virginia reducing their note and deed of trust on the business property from $600,000 to $500,000. In addition, approximately $350,-000 was paid to the Bank of Virginia to pay off the debtor's line of credit secured by the business inventory and accounts receivable, thereby in addition to the above-mentioned collateral, giving Borg-Warner a first lien on the business inventory and accounts receivables as collateral for the $900,000 line of credit. Also as part of the closing of this new line of credit, proceeds were paid to the Bank of Virginia to catch up all delinquent interests owed to the Bank of Virginia. At the closing, representatives of Borg-Warner requested and received from the debtor what they believed to be the signed and notarized personal guarantees of the debtor's father and mother.

The debtor entered into this new agreement with Borg-Warner because the business was in need of additional financing and the Bank of Virginia was unwilling to extend its existing line of credit with the debtor and the business. Most importantly for the debtor and the business, Borg-Warner was willing to lend to the debtor's business approximately 65% of eligible inventory and accounts receivable whereas the Bank of Virginia was only willing to lend the value of about 40% of the business's eligible inventory and accounts receivable. Not only was the Bank of Virginia unwilling to extend further credit but was concerned about the status of its loan to the business and was threatening to liquidate the collateral securing that line of credit. After closing the line of credit Borg-Warner sent acknowledgements of the personal guarantees to Lawrence A. Lipscomb, Jr. and his wife. Some time in March 1982, Mrs. Lawrence A. Lipscomb, Jr. called a representative of Borg-Warner and told him that neither her husband nor she had signed the personal guarantees. On March 25, 1982 representatives of Borg-Warner met with the debtor and at said meeting the debtor admitted that he had forged the signatures of his parents on the personal guarantees stating that he believed it was all he could do because without the expanded line of credit offered by Borg-Warner that the Bank of Virginia would liquidate the business. It is clear from the evidence adduced at trial that Borg-Warner would not have given the debtor and the business the $900,000 line of credit without the personal guarantees of the debtor's father and mother.

In April, 1982 the parties met for the purpose of obtaining new personal guarantees from the debtor's parents or to determine the most orderly way to liquidate the collateral. Upon learning that the debtor's parents would not enter into a new valid personal guarantee of the Borg-Warner line of credit, the parties entered into an agreement reduced to writing ("letter agreement") whereby the debtor would, in an orderly manner, sell the business inventory, equipment and realty that served as collateral for the line of credit as well as collecting the outstanding receivables. The inventory was sold, some accounts receivables were collected, some of the business equipment was sold, however, initially the debtor, who was helping with the liquidation, was unable to sell the real property. During this liquidation process, Borg-Warner paid the debtor a salary as well as some commissions on sales. After some time Borg-Warner took over liquidation of the collateral.

In August 1982, Borg-Warner purchased from Bank of Virginia the $500,000 note made by the debtor and the lumber company. The stated purpose by Borg-Warner for purchasing said note was that the debtor and the lumber company were unable to make the interest payments to Bank of Virginia and that Borg-Warner had been making all said interest payments. Borg-Warner purchased said note voluntarily without request or direction by the debtor. Most of the real estate was eventually foreclosed upon and sold except for part of the business property. (Apparently, a few assets of the business that serve as collateral for the Borg-Warner obligation remain.) The debtor, but not the business, filed for relief under the Bankruptcy Code on April 20, 1983.

## CONCLUSIONS OF LAW

Before determining whether the plaintiff, Borg-Warner, has an obligation owing to it from the debtor that may be nondischargeable in bankruptcy, this Court must determine whether the debtor has any liability to the plaintiff. The sole basis for holding the debtor liable to Borg-Warner is a personal guarantee of the obligations of Lipscomb Brothers Lumber Company signed by the debtor. The debtor/defendant does not argue that he did not sign the guarantee agreement but rather argues that as a guarantor and not a surety he is only secondarily liable and, therefore, prior to incurring any liability on the corporation's obligations the plaintiff must demonstrate that they were unable to collect the obligation from the corporation or that the corpo-

ration was insolvent. The plaintiff, on the other hand, argues that the agreement executed between the debtor and the plaintiff was, in fact, a surety obligation, thereby imposing primary liability on the debtor without regard to the corporation's insolvency. Alternatively, the plaintiff argues that if indeed the guarantee obligation is construed to be one of secondary liability that sufficient evidence exists to show that the corporation was insolvent and, therefore, the debtor is liable on the guarantee obligation.

■■■ The issue is whether the debtor was a surety or a guarantor of the corporation's obligation to Borg-Warner. If the debtor was only the guarantor, Borg-Warner would have the burden to establish the inability of the corporation to pay for the insolvency of a corporation. If the debtor is a surety no further inquiry is required to establish the debtor's liability to Borg-Warner.

> The guarantor contracts to pay, if, by the use of due diligence, the debt cannot be made out of the principal debtor, while the surety undertakes directly for the payment, and so is responsible at once if the principal makes default; or, in other words guarantee is an undertaking that the debtor shall pay; surety, that the debt shall be paid.

*Piedmont Guano & Manufacturing Co. v. Morris*, 86 Va. 941, 944–45, 11 S.E. 883, 884 (1890); *Phoenix Insurance Co. v. Lester Bros., Inc.*, 203 Va. 802, 807, 127 S.E.2d 432, 436 (1962). The guarantee which is in evidence specifically provides that the debtor, Lawrence A. Lipscomb, III, "absolutely guarantees the full and prompt payment of any and every indebtedness, liability or obligation (howsoever arising and of any nature whatever), which may now or anytime and from time to time hereafter exists or be incurred by debtor [the corporation] to [Borg-Warner].... In the event of default at anytime by debtor we promise to pay such indebtedness, liability, or obligation forthwith and without prior demand." Plaintiff's Exhibit 8. In addition, the debtor was president of the corporation who dealt directly with Borg-Warner and had

immediate notice of any default by the company or any inability to service its debt. Consequently, this Court is convinced by the facts and circumstances of this case and by the specific language of the guarantee agreement that the debtor herein should be charged as a surety and not as a guarantor and, therefore, has a primary obligation to Borg-Warner without any showing by the plaintiff of the corporation's insolvency.

Having held that the debtor is indebted to the plaintiff, Borg-Warner, and that consequently Borg-Warner· holds a claim in bankruptcy against the debtor, this Court may now determine whether said claim is nondischargeable in bankruptcy.

■■■ The plaintiff, Borg-Warner, brings this complaint to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(2) alleging that by false and fraudulent representations, consisting of a forged personal guarantee of his parents, the debtor induced the plaintiff to extend credit for which the plaintiff now may suffer a loss. It is well established that such an obligation may be rendered nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2) provided that the objecting creditor can show each of the following elements: 1) that the debtor made the representations; 2) that at the time he knew they were false; 3) that he made them with the intention and purpose of deceiving the creditor; 4) that the creditor relied on such representations; and 5) that the creditor sustained the alleged loss and damage as a result of the representations having been made. *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540, 543 (W.D.Va.1967); *In re Holt*, 24 B.R. 696 (Bankr. E.D.Va.1982). Courts must strictly construe the exceptions set forth in 11 U.S.C. § 523(a)(2). *See, Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). The objecting creditor must prove the existence of each of these elements by clear and convincing evidence. *Brown v. Buchanan*, 419 F.Supp. 199 (E.D. Va.1975).

The plaintiff alleges that the defendant fraudulently obtained credit/money from it by fraudulently and falsely representing that the personal guarantee submitted at

the closing of the $900,000 line of credit was valid in all respects. Moreover, the plaintiff alleges that this representation was made with the intent to deceive it and that the creditor reasonably relied on the validity of the personal guarantee in extending credit to the debtor and his business.

1) *Did the debtors make representations?* The debtor has admitted and, therefore, this Court holds that the debtor forged the signatures of his parents on the personal guarantees and, therefore, made false representations to the plaintiff.

2) *Were the representations known to be false when made by the debtor?* Clearly the debtor knew that the representations he made to the plaintiff in submitting a forged personal guarantee were false at the time they were made (at the loan closing) because he admitted forging the signatures.

3) *Did the debtors make the representations with the intent to deceive?* The evidence has established that Borg-Warner would not extend to the debtor or the business additional credit and that both the plaintiff and the debtor knew that without the personal guarantee of the debtor's parents the plaintiff would not extend to the debtor the $900,000 line of credit. Therefore, this Court holds that by clear and convincing evidence it has been shown that the debtor presented the forged personal guarantee to Borg-Warner with intent to deceive the plaintiff.

4) *Did the creditor rely on the representation?* The plaintiff paraded before the Court the officials at Borg-Warner involved in the loan negotiations with the debtor. They all testified that but for the personal guarantee of the debtor's parents, Borg-Warner would not have extended additional credit to the debtor and the business. Michael Morgan, the representative of Borg-Warner that dealt most directly and most frequently with the debtor regarding to the debtor's credit arrangements with Borg-Warner stated that on at least ten different occasions he told the debtor that Borg-Warner would not make the loan to the debtor and his business without his parents' personal guarantee. In addition, at the time of the closing of the subject loan, Robert McCellan, another representative of Borg-Warner, specifically requested of the debtor at the time of the closing his parents' personal guarantee of the line of credit. In fact, the plaintiff had offered to take the guaranty agreement to the debtor's parents for signing but did not after the debtor interceded and said he would do it. Moreover, the plaintiff's evidence has established that they were familiar with the debtor's father's financial condition, including the liquidity of his financial condition and that they believed that with the personal guarantee the debtor's father would help oversee operation of the business and would be a mark of confidence in his son's ability to run the business. The debtor, on the other hand, argues that the collateral that was given to secure the $900,000 line of credit was more than adequate to cover the line of credit and, therefore, Borg-Warner did not rely on the personal guarantee of his parents. This Court is satisfied that clear and convincing evidence demonstrates that the plaintiff reasonably relied on the personal guarantees of Lawrence A. Lipscomb, Jr. and his wife, which later proved to have been forged by the debtor.

5) *Did loss result from the representation?* At this point there is insufficient evidence before the Court to determine to what extent the plaintiff suffered loss due to the false representations made by the debtor. In fact, evidence is not before the Court at this time whether any obligation remains owing to the plaintiff after all of the collateral securing said obligation has been sold. Because determining just what amounts may be nondischargeable involves some intricate accounting procedures, this Court has been asked by the parties to determine whether certain categories of obligations are dischargeable or nondischargeable. In this regard, the Court finds and holds as follows.

First, any portion of the original $228,000 line of credit extended by the plaintiff to the debtor is an obligation dischargeable in bankruptcy. Second, to the extent that the plaintiff has suffered loss from the

transaction whereby the plaintiff purchased the $500,000 note made by the debtor and held by Bank of Virginia, such obligation is dischargeable in bankruptcy. Third, the amount of any obligation remaining which the debtor still owes to the plaintiff on account of the additional $700,000 line of credit granted to the debtor by the plaintiff on January 25, 1982 after all appropriate credits to the obligation for the sale of collateral is the amount of the debtor's obligation which is nondischargeable in bankruptcy. Fourth, claims arising from funds advanced by the plaintiff after discovery of the fraud, except for those advances properly and directly attributable to foreclosure and other liquidation costs (e.g. appraisal fees, auction fees, advertising costs) are dischargeable in bankruptcy. Finally, with respect to attorney fees this Court follows the American rule. Although the plaintiff may be entitled to attorney fees by contract with the debtor, any nondischargeable claim rests on a fraud theory, consequently that portion of the plaintiff's claim that represents attorney fees is dischargeable in bankruptcy.