In re Thomas E. LEDFORD and J. Gregg Sikes, Debtors.

BancBOSTON MORTGAGE CORPORATION, Plaintiff–Appellee,

v.

Thomas E. LEDFORD (91–5649); J. Gregg Sikes (91–5594), Defendants–Appellants.

Nos. 91–5594, 91–5649.

United States Court of Appeals, Sixth Circuit.

Argued April 3, 1992.

Decided July 31, 1992.

Rehearing and Rehearing En Banc Denied Sept. 17, 1992.

Paul S. Davidson (argued and briefed), D. Reed Houk (briefed), Stokes & Bartholomew, Nashville, Tenn., for plaintiff-appellee.

Joseph P. Rusnak, Tune, Entrekin & White, William Caldwell Hancock (argued and briefed), Paul E. Jennings (argued and briefed), Nashville, Tenn., for defendants-appellants.

Before: KEITH and NELSON, Circuit Judges; and TIMBERS, Senior Circuit Judge.*

DAVID A. NELSON, Circuit Judge.

This is a bankruptcy case that involves the dischargeability of bank debt incurred by a partnership to build a condominium project. After the bank had advanced the loan proceeds to the partnership in apparent reliance on the existence of a specified number of contracts for the purchase of individual condominium units, it turned out that the character of the contracts had been fraudulently misrepresented to the bank by one of the partners.

Two questions are presented: (1) whether the bankruptcy court erred in finding, as it did, that the bank acted reasonably in disbursing the money, and (2) whether, for purposes of determining dischargeability under 11 U.S.C. § 523(a)(2)(A), the fraud of one general partner should be imputed to a second general partner who had no actual knowledge of it. The district court answered no to the first question and yes to the

---

* The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, sitting by designation.

second. We agree, and we shall affirm the judgment of the district court.

I

The debtors, Thomas Ledford and J. Gregg Sikes, M.D., were general partners in a venture formed for the purpose of constructing a condominium project in Nashville, Tennessee. Mr. Ledford was also the sole stockholder and president of a development company used by the partnership in this connection. The partnership's business was managed by Mr. Ledford, and Dr. Sikes was not involved in day-to-day operations.

BancBoston lent the partnership $1.6 million to buy the land on which the project was to be built, and the bank agreed to make a construction loan in the additional amount of $4.625 million. It is only the construction loan that concerns us here.

Disbursement of the construction funds was originally contingent on the partnership's submitting contracts for the purchase of 20 individual condominium units, with down payments of at least 10%. The bank was to take a security interest in the contracts, and the loan documents provided that the contracts could not be "contingent."

Apart from the value that the purchase contracts had as collateral, the bank viewed the contracts as a measure of market interest in the condominium project. Banc-Boston had previously financed another Ledford condominium development, and had required the submission of individual purchase contracts there for the same reasons.

Experiencing difficulty in finding the requisite number of buyers willing to sign contracts before the Nashville project was built, Mr. Ledford persuaded BancBoston to reduce the number from 20 to 14 and to reduce the required down payment from 10% to 7%. In return, the bank took a $100,000 letter of credit that was to remain in force until 20 contracts meeting the bank's approval had been executed. The parties also entered into formal agreements specifying that the contracts had to be legally enforceable and had to be prepared on a form provided by BancBoston.

Although 14 contracts were submitted by the agreed deadline, several of them were subject to undisclosed side agreements not in conformity with the loan agreement. Two of the contracts were signed as an accommodation to Mr. Ledford—one by a Ledford employee and the other by a friend of an employee. Neither of the accommodation signers had any intention of actually going through with a purchase. The bankruptcy court found that Mr. Ledford had committed fraud, and this finding is not challenged on appeal. It was further found that Dr. Sikes did not know of the fraud.

BancBoston disbursed the construction funds to the partnership without contacting any of the prospective purchasers named in the contracts. The bankruptcy court found that the funds would not have been disbursed but for the bank's belief that 14 bona fide non-contingent purchase contracts were in existence. The court further found, by "clear and convincing evidence," that the bank acted reasonably in relying on the partnership's representations concerning the contracts.[1]

The condominium project was not completed on schedule, and by the time it was finally finished, all of the purchase contracts had expired. The partnership defaulted on its loans, and the two general partners filed for bankruptcy.

BancBoston contended that the claim it filed with respect to the construction loan was not dischargeable as to either partner, under 11 U.S.C. § 523(a)(2)(A), because the loan had been procured through fraud. The bankruptcy court agreed that Mr. Ledford was not entitled to a discharge, but

---

1. The Supreme Court has since held that a creditor need only prove the elements of nondischargeability by a preponderance of the evidence. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because the burden of proof does not affect our analysis in this case, we need not decide whether *Grogan* should be given retroactive effect. We note, however, that at least two other circuits have applied *Grogan* retroactively. *In re Luce,* 960 F.2d 1277 (5th Cir.1992); *Melton v. Moore,* 964 F.2d 880 (9th Cir.1992).

held that Dr. Sikes was. The district court reversed the decision as to Dr. Sikes, concluding that knowledge of Ledford's fraud should be imputed to him as a matter of law. 127 B.R. 175.

Both Ledford and Sikes have appealed, contending that BancBoston's reliance on the 14 purchase contracts was unreasonable. Dr. Sikes also contends that his indebtedness is dischargeable in any event because of his lack of actual knowledge of Ledford's fraud.

## II

■ The debtors argue that it was unreasonable for the bank to rely on the contracts because the bank admittedly made no independent inquiry into their authenticity. We think that the debtors are reading too much into the "reasonableness" requirement that our caselaw has interpolated into the text of § 523(a)(2)(A).

Section 523(a) provides, in pertinent part, that an individual debtor will not be discharged from any debt

"(2) for money ... to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive...."

Subparagraph (a)(2)(A), unlike (a)(2)(B), contains no explicit requirement that a creditor's reliance be reasonable. We have nonetheless required creditors asserting nondischargeability under § 523(a)(2)(A) to show that their reliance met a loose standard of reasonableness. *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986); *In re Ward*, 857 F.2d 1082 (6th Cir.1988).

The predecessor to the current § 523(a)(2), section 17(a)(2) of the Bankruptcy Act, did not require that a creditor's reliance be reasonable.[2] In deciding cases under Section 17(a)(2), however, the courts did consider the reasonableness of a creditor's asserted reliance as evidence bearing on the question whether the creditor had actually relied on the representation in question. See, *e.g., In re Garman*, 643 F.2d 1252 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). After § 523(a)(2)(B) of the Bankruptcy Code was enacted, we adopted the *Garman* approach for cases arising under that section. In doing so we noted that the explicit reasonableness requirement of § 523(a)(2)(B) was merely intended to incorporate the caselaw existing at the time of enactment. *In re Martin*, 761 F.2d 1163, 1166 (6th Cir.1985); *Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490 (6th Cir.1986).

In *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986), we concluded that even though there is no explicit reasonableness requirement in § 523(a)(2)(A), the approach spelled out in *Garman* and *Martin* applied to § 523(a)(2)(A) as well.[3] The reasonableness

---

**2.** Section 17(a)(2) excepted from discharge "liabilities for obtaining money ... upon a materially false statement in writing respecting his [bankrupt's] financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive...." *In re Taylor*, 514 F.2d 1370, 1372–73 (9th Cir. 1975).

**3.** The Courts of Appeals for the Fifth and the Eighth Circuits have declined to follow our reasoning in *Phillips*. *In re Allison*, 960 F.2d 481 (5th Cir.1992); *In re Ophaug*, 827 F.2d 340 (8th Cir.1987). In *Allison*, the Fifth Circuit held that "reasonable reliance is not, as a matter of law,

required under section 523(a)(2)(A)." 960 F.2d at 485. The *Allison* court maintained that (1) "the plain letter and the legislative history of subparagraphs (A) and (B) demonstrate that they espouse separate and independent grounds for the discharge exception," and (2) that the Supreme Court's decision in *Grogan v. Garner* calls into question the reasoning of cases like *Phillips* that find the fresh start policy of the Bankruptcy Code outweighs the rights of creditors who have acted unreasonably. *Id.* This reading of *Grogan v. Garner* may or may not be correct; given the grounds on which our decision rests, we need not decide the question here.

requirement of *Phillips* was not particularly rigorous; we viewed the requirement as a filter intended to isolate creditors who had acted in bad faith. *Id.* As the *Garman* court said, the decisions that refer to "reasonable" or justifiable reliance do not require the court to undertake a subjective evaluation of a creditor's lending policy and practices; the decisions teach only that dischargeability should not be denied where a creditor's asserted reliance would be so unreasonable as to negate any actual reliance. *Garman,* 643 F.2d at 1256. It was the test enunciated in *Garman* that we held appropriate under § 523(a)(2)(B), *In re Martin,* 761 F.2d at 1166, and it was the *Garman* test that we applied under § 523(a)(2)(A) in *Phillips.*

▇ Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. See, *e.g., Phillips,* 804 F.2d at 933; *Ward,* 857 F.2d at 1084; *Martin,* 761 F.2d at 1166–67; *Knoxville Teachers Credit Union,* 790 F.2d at 492–93; *Garman,* 643 F.2d at 1257–59.

▇ In the case at bar, BancBoston (which had a previous business relationship with Mr. Ledford that had given the bank no reason to mistrust him) inspected the purchase contracts submitted by Ledford to ensure that they complied with the terms of the agreement. There were no "red flags" that should have alerted the bank to the fact that two of the contracts had been signed merely as an accommodation; on the face of the contracts, there was no indication that they were fraudulent. It is unlikely, moreover, that minimal investigation would have revealed that these contracts had been signed as an accommodation. Under the circumstances, we cannot say that the bankruptcy court erred in finding that BancBoston acted reasonably in relying on the contracts. Section 523(a)(2)(A) does not ordinarily require lenders to assume that commercial borrowers who have been credible in the past will not continue to be credible. Assuming that a reasonableness requirement still exists after *Grogan v. Garner,* the requirement merely prevents creditors from looking the other way in the face of facts that ought to raise suspicions.

This case does not resemble *In re Ward,* 857 F.2d 1082, where we held that a bank that issued a credit card to the debtor without first running a credit check on him was not entitled to have the credit card indebtedness declared nondischargeable under § 523(a)(2)(A). The debtor in *Ward,* who had no previous relationship with the credit card issuer, received a credit card application as part of a nationwide direct mailing. When he returned the application form, the bank approved a credit card for him without requesting a financial statement and without checking his credit history. A credit report would have shown that he owed money on at least twelve other accounts and that he had been ordered to make restitution of $250,000 following a conviction for embezzlement. The bank that issued the card contended that it had relied on (1) the debtor's false representation on his application that he was financially responsible and would pay the charges he incurred, and (2) his implied promise each time he used the card that he would pay the charges. We concluded that it was unreasonable as a matter of law to rely on such representations without conducting the "minimal investigation and verification" that "almost certainly would have uncovered the falsity of the representations." *Id.* at 1084. Our conclusion was strengthened by the fact that the credit card indebtedness was incurred for personal use, not commercial use, and by the fact that congressional committee reports sug-

gested that consumer finance companies should use readily available independent sources of information (credit bureau reports, *e.g.*) to verify a consumer borrower's creditworthiness. H.R.Rep. No. 595, 95th Cong., 2d Sess. 130 (1977), reprinted in [1978] U.S.Code Cong. & Admin.News 5963, 6091.

In the instant case, of course, the loan was made to a sophisticated borrower for commercial purposes. As was not true in *Ward,* the lender had a prior business relationship with the borrower. There is no reason to believe, moreover, that minimal investigation by BancBoston would have revealed that two of the purchase contracts on which the bank relied had been signed as an accommodation by people who had no intention of performing. It would not be so unreasonable for a lender in Banc-Boston's position to rely on the contracts as to make it unlikely that reliance actually occurred.

\*       \*       \*       \*       \*       \*

■ We turn now to the issue peculiar to Dr. Sikes. It is undisputed that under Tennessee agency law Dr. Sikes is liable, regardless of his own culpability, for the full amount of the partnership's debt to Banc-Boston. It is also undisputed that Dr. Sikes' liability under state law gives Banc-Boston a valid claim against his estate for the full amount of the partnership's debt. It is less clear, however, whether federal bankruptcy law requires some culpability on the part of Dr. Sikes if BancBoston's claim against him is to be held nondischargeable in bankruptcy. Dr. Sikes contends that even if the bank's reliance on the misrepresentations was reasonable, the debt should be deemed dischargeable as to him as long as he did not know of the fraud. This argument raises a question of first impression in our circuit: whether, for purposes of § 523(a)(2)(A), the fraud of one partner can be imputed to another partner who had no actual knowledge of it.

The Court of Appeals for the Fifth Circuit had occasion to address this question recently in *In re Luce,* 960 F.2d 1277 (5th Cir.1992). There a husband and wife, Mr. and Mrs. Luce, were partners in several partnerships that obtained loans from finance companies through fraud perpetrated by Mr. Luce. After bankruptcy was declared, the finance companies challenged the dischargeability of the partnership's debt insofar as both of the Luces were concerned. The bankruptcy court found the debts nondischargeable as to both, and the district court affirmed. On appeal to the Fifth Circuit, Mrs. Luce argued that the debt should be held dischargeable as to her because she had no knowledge of the fraud perpetrated by her husband.

Citing with approval the district court's opinion in the instant case, the court of appeals upheld the bankruptcy court's conclusion that knowledge of the fraud should be imputed to Mrs. Luce. The court said that the Luces' marital relationship was not relevant to its decision, and based its holding on the facts that (1) Mrs. Luce was a partner, (2) Mr. Luce made the misrepresentations while acting on behalf of the partnerships in the ordinary course of business, and (3) as a partner, Mrs. Luce shared in the monetary benefits of the fraud.

The Fifth Circuit's analysis, which we find persuasive, is directly applicable here. Like Mr. Luce, Mr. Ledford perpetrated his fraud while acting on behalf of the partnership in the ordinary course of the partnership's business. Like Mrs. Luce, Dr. Sikes shared in the monetary benefits of the fraud. Mr. Ledford did not divert the proceeds of the construction loan to his personal use. The funds were used for partnership purposes; they financed a condominium project from which Dr. Sikes stood to profit.

The result we reach in this case is consistent with the decisional law that existed before enactment of the Bankruptcy Code. See *Strang v. Bradner,* 114 U.S. 555, 561, 5 S.Ct. 1038, 1041, 29 L.Ed. 248 (1885). There the Supreme Court, speaking through the elder Justice Harlan, held that for purposes of determining dischargeability of indebtedness, one partner's fraud may be imputed to other partners who had no knowledge of it. The fraud in *Strang* was perpetrated within the scope of the

partnership's business, and, as in the case at bar, the innocent partners received the fruits of the fraudulent conduct.

For the reasons stated, and because we do not find any of the debtors' remaining arguments persuasive, the judgment of the district court is AFFIRMED.