In re Charles Marvin KAHLER, Debtor.

**HOUSEHOLD FINANCE CORP., Plaintiff,**

v.

**Charles Marvin KAHLER, Defendant.**

**Bankruptcy No. 95–21050–J.
Apn. No. 95–2084–J.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Oct. 10, 1995.

Glenn R. Tankersley, Virginia Beach, VA, for debtor.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This case is before the Court on Household Finance Corp.'s (Household) complaint to determine the dischargeability of two debts incurred by the debtor, Charles Marvin Kahler, pursuant to § 523(a)(2)(A). After reviewing the evidence and the arguments of counsel, we make the following determinations.

### FINDINGS OF FACT

The facts in this matter are uncontroverted. The debtor was a self-employed home improvement contractor who historically earned approximately $20,000 per year. His financial troubles began when he decided to invest in the commodities market. Like other investors in this extremely volatile market, he stood to earn a substantial return had his investments turned out as he had hoped. However, his investments failed and his financial condition plummeted accordingly. By the summer of 1994, he had lost almost all of his savings and accumulated large debts. Despite losing and owing much, the debtor continued to trade in commodities, apparently covering his margins with borrowed money. The debtor maintained this course of action hoping that his investments would somehow rebound to restore his prosperity. Any rebound in the market came too late for the debtor, who ceased trading by

January 19, 1995 when he was unable to satisfy his margin calls.

During the period in which he actively traded in commodities, the debtor financed his living expenses with his savings and borrowed money. Before April 1994, the debtor paid his living expenses and trading costs with his savings. However, after April 1994, the debtor borrowed and incurred credit card debts to cover these losses and expenses.

Deciding that filing bankruptcy would be necessary, the debtor met with his counsel on February 4, 1995. On March 2, 1995, the debtor filed the present bankruptcy petition, in which he scheduled $135,358 of unsecured debts. Most of the unsecured debts originated from advances and charges received from credit cards and other lines of credit.

The debts at issue were incurred when the debtor received two cash advances totalling $2,400.00 from Household. Before these transactions, the debtor had no business relationship with Household. Notwithstanding the fact that the debtor had 19 credit card with substantial debts on each, Household sent him a check for $1,500.00 on December 8, 1995. The debtor did not apply for nor solicit this check. In addition, Household did not require the debtor to make any disclosure of his financial status and the debtor made no representation to Household regarding the same. The proceeds from this advance were used by the debtor to pay his margin losses so that he could continue to hold his commodity investments.

The debtor received a second check from Household on January 16, 1995. This time a representative of Household called the debtor and told that him that he was entitled to receive another check for $900.00. Again, Household did not ask the debtor about his financial condition and the debtor did not make any statements regarding the same. The debtor accepted the offer and cashed the check when it arrived. Once more he used the proceeds to cover his margin losses. The debtor did not make any payments toward the debts. Household offered no evidence at trial as to any credit checks or investigations of the debtor at the time of either of the two advances, nor did it offer any evidence about how Household came to select the debtor for its offer of credit.

## CONCLUSIONS OF LAW

The exceptions to a discharge are governed by 11 U.S.C. 523. The subsection affecting the instant debts states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or renewal, or refinancing of credit, to the extent obtained by—

(A) false pretense, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition ...

*11 U.S.C. 523(a)(2)(A) (1995).*

In addition, certain cash advance debts are presumed nondischargeable under § 523(a)(2)(C), which states:

[F]or purposes of subparagraph (A) of this paragraph ... cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable ... *11 U.S.C. 523(a)(2)(C) (1995).*

■ To obtain a judgment rendering a debt nondischargeable under § 523(a)(2)(A), a creditor must establish:

(1) that the debtor made the representation;

(2) that at the time, the debtor knew the representation was fraudulent;

(3) that the debtor's conduct was with the intention and purpose of deceiving or defrauding the creditor;

(4) that the creditor relied on the debtor's representations;

(5) that the creditor sustained loss and damage as the proximate result of the representation.

*Lawyers Title Insurance Company v. Pitt (In re Pitt),* 157 B.R. 585, 587 (E.D.Va.1991); *Maneval v. Davis (In re Davis),* 155 B.R.

123, 131 (Bankr.E.D.Va.1993); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 464–465 (Bankr.E.D.Va.1992); *Zedd v. Sandler (In re Sandler)*, 143 B.R. 67, 70 (Bankr.E.D.Va.1992); *In re Fravel*, 143 B.R. 1001, 1006 (Bankr.E.D.Va.1992); *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830 (Bankr.E.D.Va.1991); *Central Fidelity Bank and Virginia First Savings Bank, F.S.B. v. Higginbotham (In re Higginbotham)*, 117 B.R. 211, 214 (Bankr.E.D.Va.1990).

■ The creditor bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ We first address Household's argument that the debts arising from both checks are presumed nondischargeable under § 523(a)(2)(C). In support of this conclusion, Household argues that the 60-day presumption period begins to toll from the date that the debtor first contacted his attorney in contemplation of bankruptcy. This construction, it argues, is consistent with the intent of preventing debtors from incurring debts with an eye toward filing bankruptcy. We reject this construction of § 523(a)(2)(C). In the absence of any ambiguity, statutory construction should be limited to the plain language of the statute. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The plain language of § 523(a)(2)(C) clearly provides that the presumption of nondischargeability period is 60 days before the order for relief under this title. Accordingly, there is no presumption of nondischargeability for these debts for purposes of § 523(a)(2)(A).

■ Turning back to § 523(a)(2)(A), we address the core of Household's complaint. The first element requires Household to prove that the debtor represented his ability to pay or intent to repay. Household argues that the debtor represented his ability or intent to repay when he cashed the checks received from Household. In contrast, the debtor argues that he made no representations of any kind. No representation was made, the debtor argues, because the checks were unsolicited and information about his financial condition was not disclosed. Consequently, the debtor contends, the acceptance of these checks, without more, negates the existence of this element.

■ Misrepresentation may be implied by silence. *Central Bank v. Kramer (In re Kramer)*, 38 B.R. 80, 82 (Bankr.La.1984). No overt misrepresentation is required under § 523(a)(2)(A). *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 993 (Bankr.M.D.N.C. 1994); *Kramer*, 38 B.R. at 82. Instead, omissions or a failure to disclose by the debtor can constitute misrepresentations for the purposes of nondischargeability where the circumstances of the cases are such that omissions or failure to disclose creates a false impression which is known by the debtor. *Bozzano*, 173 B.R. at 993–994. A misrepresentation may exist notwithstanding the finding that he did not affirmatively state a misrepresentation or was never asked to disclose pertinent facts. *Bozzano*, 173 B.R. at 993–994. In the instant case, the debtor's failure to disclose his financial troubles constitutes misrepresentations. When he cashed the checks and when he spoke with Household, his failure to disclose his financial troubles created the false impression that he could pay. Accordingly, we conclude that the debtor impliedly represented his financial condition when he cashed the checks.[1]

■ The second element requires Household to prove, that the at the time of the representation, the debtor knew the repre-

---

1. We recognize that the instant case is different from the ordinary credit card cases, in which the courts have created the implied misrepresentation rationale, in that the debtor in the instant case dealt directly with the creditor instead of a third-party merchant. Third party credit card transactions are not typical fraud cases due to the difficulty, if not impossibility, of applying the concepts of representation and reliance. First, the creditor seeking relief is not the merchant who accepts the representation that the creditor will pay him. Second, there is an ongoing relationship between the debtor and the creditor with only infrequent inquiry being made concerning the status of the debtor's financial condition. Recognizing this problem, courts have modified the element of representation. The majority position appears that the debtor implies a representation to the creditor that he has both the intent and ability to pay purchases and advances.

sentation was fraudulent. Household contends that the loss of his savings, the failure of his commodity holdings, and the lack of another income source are evidence that the debtor knew or should have known that he could not repay this debt when he incurred it. In contrast, the debtor argues that the representation was not fraudulent because he believed that by using the proceeds from Household to hold his commodities investment would allow him to weather his losses until they became profitable and thus allow him to pay his debts.

When the debtor received the checks, the debtor was suffering severe financial problems. He had lost his savings and could no longer pay his margin losses. Any possibility of repayment was remote. With these problems, the debtor knew or should have known that he did not have the ability or the intent to repay. Accordingly, we conclude that the debtor knew or should have known that his representations were fraudulent when he made them.

■■■ The third element requires Household to prove that the debtor made the misrepresentations with the intent to defraud. Because direct proof of fraudulent intent is almost impossible to produce, fraudulent intent can be inferred from circumstantial evidence. *Ketaner,* 154 B.R. at 465. Additionally, where a person recklessly makes false representations that the person knows or should know will induce another to rely on it, intent to deceive may logically be inferred. *United Leasing Corp. v. Roop,* 48 B.R. 310, 312 (E.D.Va.1985); *Ketaner,* 154 B.R. at 465; *Woolley,* 145 B.R. at 834; *Fravel,* 143 B.R. at 1010. However, the recklessness must exceed negligence and rise to the level of reckless disregard for truth. *Ketaner,* 154 B.R. at 465; *Fravel,* 143 B.R. at 1010; *Woolley,* 145 B.R. at 830.

In the instant case, the debtor knew of his serious financial problems when he cashed the checks. He had no source of income and financed his living expenses with his credit cards. With other debts, including margin losses from the commodities trading, acutely mounting, we are not persuaded by the debtor's assertion that he thought he could repay. Furthermore, there was no indication how the debtor would or could be able to repay any of the debts. These facts together lead us to find that the debtor recklessly disregarded the truth when he represented that he had the ability to repay. Accordingly, we conclude that the debtor had the requisite fraudulent intent when he made the representations.

■■■ The fourth element requires that the creditor relied on the debtor's representations. Household contends that reliance in credit card transactions exists every time a debtor used the card. We agree. Direct proof of reliance is difficult in credit card cases. Whereas reliance in the normal credit transaction contemplates that the issuer of credit make personal inquiry of the debtor at the time of each credit transaction, credit card cases involve a continuing relationship between the debtor and creditor and only infrequent inquiry as to the continuing state of the debtor's financial affairs. *First Deposit National Bank v. Pursley (In re Pursley),* 158 B.R. 664, 669 (Bankr.N.D.Ohio 1993). As a result, reliance, or lack thereof, cannot be shown as it is in the normal credit transaction by the creditor's conduct in response. *Pursley,* 158 B.R. at 669. Consequently, actual reliance is evidenced by the fact that the card holder actually used the card. *Bank of Virginia v. Davis (In re Davis),* 42 B.R. 611, 613 (Bankr.E.D.Va.1984) and cases cited therein; *Pursley,* 158 B.R. at 669.

In addition, the direct card industry functions upon the issuer's guarantee of payment to the merchant. *Citicorp Credit Services, Inc. v. Hinman (In re Hinman),* 120 B.R. 1018, 1022 (Bankr.N.D.1990). Reliance by the issuer is inherent in the system because a card holder in using the credit card forces the issuer to honor its guarantee to the merchant. *Hinman,* 120 B.R. at 1022. The debtor, in presenting the card and thereby forcing the issuer to honor its guarantee to merchants necessarily compels reliance by the issuer. *Hinman,* 120 B.R. at 1022, citing *In re Cullen,* 63 B.R. 33, 36 (Bankr.E.D.Mo. 1986).

■■■ Although Household relied upon the debtor's misrepresentations, it must also prove that its reliance was reasonable. We

note that the circuits disagree on whether a creditor must show reasonable reliance.[2] However, most of the courts in this circuit require the creditor's reliance to be reasonable. *See Maurer v. Mallen (In re Mallen),* 146 B.R. 681, 683 (Bankr.E.D.Va.1992), (mere persuasion by strong personality does not ordinarily amount to fraud, absent some false pretense or misrepresentation upon which the victim reasonably relies); *Seymour v. Yates (In re Yates),* 118 B.R. 427, 432 (Bankr.S.C.1990), (creditor failed to show reasonable reliance); *Lisk v. Criswell (In re Criswell),* 52 B.R. 184, 198 (Bankr.E.D.Va. 1985), (reasonable reliance is an element of a cause of action under § 523(a)(2)(A); *Borg–Warner Acceptance Corporation v. Lipscomb (In re Lipscomb),* 41 B.R. 112, 117 (Bankr. E.D.Va.1984); *Cuneo v. Smith (In re Cuneo),* 25 B.R. 396, 398 (Bankr.Md.1982), (unsophisticated creditor reasonably relied upon misrepresentations of businessman due to special relationship); *Bialek's Medical Arts Clinical Reference Laboratory, Inc. v. Patch (In re Patch),* 22 B.R. 970, 972 (Bankr.Md. 1982), (debt discharged because plaintiffs unreasonably relied on misstatements); *see Lawyers Title Insurance Company,* 157 B.R. at 589, (assuming, without deciding, that the more significant showing of reasonable reliance is required, creditor's reliance was unreasonable); *Cf. Rowe v. Showalter (In re Showalter),* 86 B.R. 877, 881 (Bankr.W.D.Va. 1988), (reliance in loans between friends does not need to be reasonable) and *O'Connor,*

*CPO, Inc. v. Booker (In re Booker),* 165 B.R. 164 (Bankr.M.D.N.C.1994), (finding that creditors were reasonable in their reliance although the court declines to rule whether there is such a reasonableness requirement).

▪ To determine whether a creditor was reasonable in its reliance, other courts have examined several factors, which may include:

(1) whether the debtor and creditor had a business relationship;[3]

(2) whether the creditor conducted a credit check;

(3) whether the creditor examined the debtor's record in meeting his credit card debts;[4]

(4) whether there had been previous dealings with the debtor that produced a relationship of trust;[5]

(5) whether the debt was incurred for personal or commercial reasons;[6]

(6) whether there were any red flags that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate;[7]

(7) whether minimal investigation would have revealed the inaccuracy of the debtor's representation;[8]

---

**2.** Circuits requiring the reliance to be reasonable: *Century 21 Balfour Real Estate v. Menna (In re Menna),* 16 F.3d 7 (1st Cir.1994); *Longo v. McLaren (In re McLaren),* 3 F.3d 958 (6th Cir. 1993); *First Bank of Colorado Springs v. Mullet (In re Mullet),* 817 F.2d 677 (10th Cir.1987); *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577 (11th Cir.1986); *First National Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421 (7th Cir.1985), *but see Mayer v. Spanel International Ltd.,* 51 F.3d 670 (7th Cir.1995), (doubting that *Kimzey* was right and relied upon actual knowledge standard).

Circuits not requiring the reliance to be reasonable: *Allison v. Roberts (In re Allison),* 960 F.2d 481 (5th Cir.1992); *In re Ophaug,* 827 F.2d 340 (8th Cir.1987).

The Ninth Circuit requires justifiable reliance: *Eugene Parks Law Corporation Defined Benefit Pension Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454 (9th Cir.1992).

**3.** *See The May Co. v. Chech (In re Chech),* 96 B.R. 781, 784 (Bankr.N.D.Ohio 1988), (one-year credit relationship between creditor and debtor did not establish reasonable reliance); *Booker,* 165 B.R. at 170, (eight-year relationship between creditor and debtor was a basis for reasonable reliance).

**4.** *First Deposit National Bank v. Pursley (In re Pursley),* 158 B.R. 664, 669 (Bankr.N.D.Ohio 1993).

**5.** *BancBoston Mortgage Corporation v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir. 1992).

**6.** *Ledford,* 970 F.2d at 1560.

**7.** *Ledford,* 970 F.2d at 1560.

**8.** *Ledford,* 970 F.2d at 1560.

(8) whether the debtor and creditor had a personal relationship; [9]

(9) the sophistication of the parties; [10]

(10) whether the creditor or the debtor solicited the extension of credit; [11]

(11) the length of time of any relationship.

■ In the case *sub judice*, the debtor had no personal or business relationship with Household before receiving the first unsolicited check in the mail. Household, a sophisticated creditor, had only a 1–month relationship with the debtor when it telephoned the debtor to offer the second check. In addition, Household did not provide any evidence that it conducted a credit check or whether it examined the debtor's record in meeting his credit card debts. A credit check likely would have raised red flags that would alert an ordinary prudent lender to the possibility that the representations relied upon were not accurate. A minimal inquiry into the debtor's finances would have revealed that he made about $20,000 per year with tremendous debt. This minimal investigation also presumably would have revealed the inaccuracy of the debtor's representation and alerted the creditor that the risk of loss in extending credit to him would be great. While a requirement of inquiry before each extension of credit would be impracticable in some credit transactions, a creditor has a duty to make some inquiry into the debtor's financial condition before extending credit. *Chech,* 96 B.R. at 784. Furthermore, a creditor can hardly be heard to complain about a debtor's implied misrepresentation concerning his ability to pay and its reliance thereon if it neglected to conduct some inquiry before providing credit to the debtor or ignored its results. *Chech,* 96 B.R. at 784. With the foregoing analysis in mind, we conclude that Household was not reasonable in its reliance of the debtor's representations. Accordingly, we hold that the debts at issue are dischargeable.

We also note that our conclusion is supported by *Manufacturer's Hanover Trust Company v. Ward (In re Ward),* 857 F.2d 1082 (6th Cir.1988), in which substantially similar facts exist. In *Ward,* the creditor sought to except from discharge a debt incurred by the debtor from the use of a credit card under § 523(a)(2)(A). Similar to the case at bar, the creditor engaged in direct mail solicitation to enroll new members. The creditor mailed a credit card to the debtor with a pre-approved credit limit. During a 23–day period the debtor incurred debts on the account. The creditor did not request a financial statement from the debtor nor conducted a credit check, which would have revealed 12 credit card debts (and an embezzlement conviction ordering a restitution of $250,000). Like the case at bar, the creditor here did not provide evidence that it conducted a credit check. The court held that the debt was dischargeable because the creditor's reliance upon the debtor's misrepresentation (that he would repay) was unreasonable as a matter of law absent evidence that the creditor conducted even a superficial credit investigation. *Ward,* 857 F.2d at 1084.

We are persuaded by the analysis in *Ward* and adopt its policy considerations. The court in *Ward* stated:

> From the perspective of the bankruptcy proceeding, it is inequitable to reward a possibly imprudent creditor who failed to detect the debtor's misrepresentation by excepting her debt from discharge, while the debtor's other more prudent creditors have their claims evaluated collectively. As a matter of fairness among creditors, it is inappropriate to allow a creditor who is likely to have been imprudent to participate in the liquidation of the debtor's assets. *Ward,* 857 F.2d at 1084–1085, citing Zeigler, *The Fraud Exception to Discharge in Bankruptcy: A Reappraisal,* 38 Stan.L.Rev. 891, 907–08 (Feb. 1986).

Furthermore, the decision will encourage financial institutions to more prudently inves-

---

**9.** *See Booker,* 165 B.R. at 170, in which the creditors were reasonable in the reliance of the debtor's misrepresentations since they considered the debtor a friend and trusted him with their financial matters.

**10.** *Cuneo v. Smith (In re Cuneo),* 25 B.R. 396 (Bankr.Md.1982), in which an unsophisticated hair stylist creditor reasonably relied upon misrepresentations of high-powered businessman.

**11.** *See Manufacturer's Hanover Trust Company v. Ward (In re Ward),* 857 F.2d 1082 (6th Cir.1988).

tigate the credit worthiness of high-risk borrowers and will deter potential debtors from engaging in credit card fraud. *Ward,* 857 F.2d at 1085. Disallowing a non-dischargeability claim when the financial institution fails to investigate would best comport with the intent of Congress (which was concerned that creditors investigate and verify debtors' information) and would discourage fraudulent credit transaction. *Id.* Our result would prevent preferential protection, at the expense of other unsecured creditors, to financial institutions that profit from extending consumer credit at the risk of non-payment, which risk is factored into finance charges. *Id.*

### ORDER

For the reasons stated above, the debts are hereby dischargeable pursuant to § 523(a)(2)(A). Since the debtor received his discharge on June 7, 1995, these debts are now DISCHARGED.

The Clerk shall mail copies of this Memorandum Opinion and Order to counsel for the debtor and for Household.

IT IS SO ORDERED.