**In re Edward D. ECKERT, M.D. a/k/a Edward D. Eckert, Debtor.**

**FLEMING COMPANIES, INC. d/b/a Fleming Foods, Inc. successor by merger to Malone & Hyde, Inc., Plaintiff,**

v.

**Edward David ECKERT, Defendant.**

**Bankruptcy No. 97–31509.**
**Adversary No. 97–917.**

United States Bankruptcy Court,
S.D. Florida.

April 16, 1998.

Lynn M. Gollin, Miami, FL, for Fleming Companies, Inc.

Michael Bakst, West Palm Beach, FL, for Edward D. Eckert.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

The issue before the Court is whether a debt for $2.4 million should be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) because of a false financial statement.

The Plaintiff, Fleming Companies, Inc., is a full-line wholesale supplier of food, grocery, and related products to the retail trade. It is the successor in interest by merger to Malone & Hyde, Inc.

The Debtor/Defendant, Edward Eckert, is a medical doctor specializing in obstetrics and gynecology. He filed a petition pursuant to Chapter 11 of the Bankruptcy Code on April 1, 1997. As of the petition date, Dr. Eckert was indebted to Fleming in the total amount of $2.4 million by virtue of personal guarantees executed by Dr. Eckert guaranteeing the debts of Whole Earth Galleria, Inc., f/k/a Sureway Supermarkets of Florida II, Inc.

Dr. Eckert was an investor in a venture which became known as Whole Earth Food, Inc., the parent company of Whole Earth Galleria, Inc. He was brought into this venture by David Morgenstern. Dr. Eckert had previously met Mr. Morgenstern when he delivered two of Mr. Morgenstern's children.

Morris Schwartz and Peter Casoria owned a retail grocery store known as Sureway Supermarkets of Florida II, Inc. located at 2501 E. Sunrise Boulevard in Fort Lauderdale, Florida. Sureway owed Malone & Hyde in excess of $2 million pursuant to a promissory note and supply agreement. Mr. Schwartz personally guaranteed Sureway's debt to Malone & Hyde; Mr. Casoria personally guaranteed $600,000 of Sureway's debt to Malone & Hyde.

In December 1993, Malone & Hyde agreed to finance Whole Earth Foods, Inc.'s purchase of Sureway's assets and provide product and inventory to the Galleria store. The parties to the December agreement agreed that Mr. Morgenstern would personally guarantee the indebtedness and Mr. Schwartz and Mr. Casoria would reaffirm their respective guarantees. This agreement was never consummated because Mr. Casoria refused to agree to the sale unless he was released from his personal guaranty. Dr. Eckert's name was not raised as a potential guarantor at this time.

In May 1994, Malone & Hyde agreed to finance Galleria's purchase of Sureway's assets and provide product and inventory to the Galleria store. This transaction included an agreement to release Mr. Casoria from

his guarantee and include Dr. Eckert as a guarantor.

On May 16, 1994, Malone & Hyde and Galleria entered into a loan agreement for the purchase of Sureway's assets. Galleria executed and delivered to Malone & Hyde an installment promissory note in the original principal amount of $2,098,601.67 and a supply agreement. Malone & Hyde also obtained security agreements and a collateral assignment of a lease for the premises where Galleria was to operate a retail grocery store.

In September 1994, Galleria failed to make certain payments to Malone & Hyde which were due pursuant to the loan documents. By this time, Dr. Eckert had assumed control of Galleria and its affiliated companies. Dr. Eckert explained that Mr. Morgenstern was mis-managing the business, and he wanted to salvage it. In conjunction with his takeover of Galleria, Dr. Eckert approached Malone & Hyde and requested that Malone & Hyde continue to supply product and inventory to Galleria. On September 15, 1994, Dr. Eckert executed a second guaranty, pursuant to which he reaffirmed his obligation to pay all debts of Galleria which were then, or in the future, owed to Malone & Hyde. The loan documents, including the guarantees, were subsequently assigned to Fleming by Malone & Hyde.

Dr. Eckert's attempts to save the Galleria operation were unsuccessful. Upon the occurrence of several events of default, Malone & Hyde accelerated and declared immediately due and payable from Galleria and Dr. Eckert all amounts owing under the loan documents. Galleria wound up in bankruptcy, and Dr. Eckert's personal bankruptcy soon followed.

Prior to accepting Dr. Eckert as a guarantor of Galleria's indebtedness, Fleming reviewed Dr. Eckert's personal financial statement dated December 8, 1993. Nobody at Fleming specifically asked Dr. Eckert, in writing or orally, for the financial statement, and it is not clear how Fleming received the statement. Fleming does not have an original signature on the financial statement. Dr. Eckert claims that he neither prepared nor directed anyone to prepare, did not sign, and did not submit the financial statement.

He does admit that the signature looks like his prescription signature, i.e. the form of his signature which he used when writing prescriptions for his patients. Fleming maintains that the financial statement was a materially false statement, upon which it reasonably relied in making its final decision to enter into the May 1994, loan transaction with Galleria. Accordingly, Fleming has filed this adversary proceeding asking that its debt be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

■ 11 U.S.C. § 523(a)(2)(B) provides in relevant part:

(e) A discharge...does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property or services reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

The Plaintiff must prove each of these elements by a preponderance of the evidence in order to succeed under this section. *In re Miller,* 39 F.3d 301, 304 (11th Cir.1994).

It is undisputed that there is a statement in writing respecting the Debtor's financial condition. The issues are whether Dr. Eckert published the financial statement with intent to deceive, whether it was materially false, and whether Fleming reasonably relied on it.

■ Fleming has failed to prove by a preponderance of the evidence that Dr. Eckert published the financial statement with intent to deceive. Fleming did not produce any evidence that it specifically requested Dr. Eckert to prepare a financial statement, and no one at Fleming could positively state that Dr. Eckert delivered the financial statement to Fleming. The financial statement

that Fleming received did not have an original signature, and Dr. Eckert denied preparing the statement. Although it is now generally accepted that a debtor need not sign a document in order to satisfy the writing requirement of § 523(a)(2)(B), the debtor must affirm the writing in some respect. *In re Kaspar,* 200 B.R. 399, 401–02 (D.Colo.1996). There was no evidence that Dr. Eckert ever acknowledged, adopted, or even saw the financial statement. No one from Fleming discussed the financial statement with Dr. Eckert. Moreover, the financial statement contained several errors—an incorrect home telephone number for Dr. Eckert and the wrong city for the location of some real property—that Dr. Eckert would not have made if he prepared or signed the document. Under these circumstances, the Court cannot find that Dr. Eckert published the financial statement.

■ The next question is whether the financial statement was materially false. A materially false statement has been described as "one that contains an important or substantial untruth. The measuring stick of material falsity is whether the financial institution would have made the loan if the debtor's true financial condition had been known". *In re Stratton,* 140 B.R. 720, 722 (Bankr.N.D.Ill.1992). Fleming argues that the financial statement is false because three commercial properties with equity in excess of $2 million are listed in the financial statement as being owned by Dr. Eckert personally when in fact they were owned by corporations whose stock was owned 100% by Dr. Eckert. The corporations were not listed in the financial statement. Thus, this is not a situation where a debtor double counts an asset by listing the value of the corporation and the value of the real estate. The Court does not find it unusual for a lay person to list property on his personal financial statement that is in fact owned by his closely held corporation. Dr. Eckert could have listed the corporations on the financial statement at the same value as the land itself, while not listing the land separately, and the dollar number of assets would have been unchanged. Fleming could have pursued the stock in the corporations to satisfy its claim. Under these circumstances, the listing of the

real estate assets on the financial statement was not materially false.

■ Fleming further argues that the financial statement was materially false because it does not disclose that the Comprehensive Capital Securities account is an IRA/Retirement account and therefore an exempt asset. However, the financial statement does not ask the person completing the statement to identify which assets are exempt. The form used for the financial statement may have been incomplete for failing to request this information, but this is not Dr. Eckert's fault. If Fleming wanted to know which assets were exempt, then Fleming should have inquired of Dr. Eckert after reviewing the financial statements, or supplied Dr. Eckert with a form that asked for this information.

■ Notwithstanding the foregoing, the Court finds that the financial statement was materially false because it greatly overstated Dr. Eckert's income. The financial statement indicated that Dr. Eckert had $520,000 in salary, bonuses, and commissions, plus $58,000 in dividends and interest, $27,000 in net rental and lease income, and $100,000 in capital gains. In fact, Dr. Eckert made substantially less than this amount. His 1992 tax return showed business income of $371,899 (adjusted gross income of $350,561); his 1993 tax return showed business income of $118,777.75 (adjusted gross income of negative $7269.99). This huge gap between the income tax returns and the income reflected on the financial statement constitutes a materially false statement.

■ The next question is whether Fleming reasonably relied on the financial statement. To determine whether a creditor was reasonable in its reliance, a court must consider the totality of the circumstances. *First National Bank of Olathe, Kansas v. Pontow,* 111 F.3d 604, 610 (8th Cir.1997). Factors to be considered in making this determination include the following:

(1) whether the debtor and the creditor had a business relationship;

(2) whether the creditor conducted a credit check;

(3) whether the creditor examined the debtor's record in meeting his credit card debts;

(4) whether there had been previous dealings with the debtor that produced a relationship of trust;

(5) whether the debt was incurred for personal or commercial reasons;

(6) whether there were any red flags that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate;

(7) whether minimal investigation would have revealed the inaccuracy of the debtor's representation;

(8) whether the debtor and creditor had a personal relationship;

(9) the sophistication of the parties;

(10) whether the creditor or the debtor solicited the extension of credit; and

(11) the length of time of any relationship.

*In re Kahler*, 187 B.R. 508, 514–15 (Bankr. E.D.Va.1995) (footnotes omitted). To this list, the Court adds the amount of money involved. The more money there is at stake, the more investigation is required.

■ In this proceeding, Fleming did not even conduct a cursory investigation. Fleming did not run a credit check on Dr. Eckert. Although Dr. Eckert's real estate holdings were a substantial part of his assets, Fleming did not conduct a title search. Indeed, Fleming did not even drive by the properties to see if they were where they were supposed to be. Fleming did not check with the banks that held mortgages on the properties. Fleming did not ask to see Dr. Eckert's income tax returns to verify his income. No one from Fleming discussed any part of the financial statement with Dr. Eckert. Fleming simply buried its head in the sand and blinded itself to the information it needed. *See, In re Gallo*, 216 B.R. 306, 309–10 (1st Cir. BAP 1998).

Fleming suggests that it was excused from any investigation because there were no red flags. It is more accurate to say that Fleming simply ignored a number of red flags. First, Fleming did not have an original signature on the financial statement. Second, no one could explain exactly how Fleming received the statement. Third, the financial statement was five months old. *See, In re Delgado*, 151 B.R. 618, 622 (Bankr.S.D.Fla. 1993). Fourth, Dr. Eckert's home phone number on the financial statement was incorrect. Finally, the real property listed on the financial statement at 100 Ocean Trail, Boca Raton, is actually located in Jupiter.

Fleming did not have a business or personal relationship with Dr. Eckert. There had been no relationship of trust between the parties. Indeed, Dr. Eckert was not part of the original transaction in December 1993, and he was only brought into the deal as a guarantor in May 1994. These circumstances mandated at least a minimal investigation of Dr. Eckert's financial statement before Fleming could reasonably rely on it. This is especially true where the guaranty was for over $2 million.

■ The final issue is whether the Debtor may be awarded attorney's fees and costs. 11 U.S.C. § 523(d) is not applicable to this proceeding because it only applies to consumer debts; this proceeding involved a business debt. However, the contracts upon which Fleming's debt is based contain provisions for the award of attorney's fees. If Fleming had prevailed in this proceeding, then Fleming would have been entitled to enforce the contractual provision allowing reasonable attorney's fees. Pursuant to Florida Statute § 57.105(2),

> If a contract contains a provision allowing attorney's fees to a party when he is required to take any action to enforce the contract, the court may allow reasonable attorney's fees to the other party when the party prevails in any action, whether as plaintiff or defendant, with respect to the contract.

It has been specifically held that "[a]ny action includes a dischargeability proceeding to collect a debt under a contract." *In re Woollacott*, 211 B.R. 83, 87 (Bankr.M.D.Fla.1997). The *Woollacott* court reasoned that this provision serves to safeguard a debtor's fresh start by insuring that a debtor who prevails in a dischargeability proceeding is not burdened with the additional attorney's fees in-

curred in defending the dischargeability action. Accordingly, the Court finds that Dr. Eckert is entitled to an award of attorney's fees and costs from Fleming, with the amount of such fees and costs to be determined at a separate hearing.

For the foregoing reasons, the debt of the Defendant, Edward Eckert, to the Plaintiff, Fleming Companies, Inc., is determined to be dischargeable. The Court further finds that Dr. Eckert is entitled to an award of attorney's fees and costs, with the amount of such fees and costs to be determined at a separate hearing.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.