**In re Alberto J. LARRIEU and Diane E. Larrieu, Debtors.**

**Peoples Thrift Savings Bank, Plaintiffs,**

**v.**

**Alberto J. Larrieu and Diane E. Larrieu, Defendants.**

**Bankruptcy No. 96–32493. Adversary No. 97–247.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 4, 1999.

Mark F. Himsworth, Carl Weiner, Lansdale, PA, for debtors.

Charles M. McCuen, Andrew Ominsky, Philadelphia, PA, for plaintiff.

## MEMORANDUM OPINION[1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

The matter before the court is a Second Amended Complaint Seeking Denial of Discharge of Debt Under Bankruptcy Code Section 523 and Other Relief filed on behalf of Peoples Thrift Savings Bank.[2] Count I of the Second Amended Complaint objects to dischargeability of debt under § 523(a)(2)(B).[3] The "Other Relief" referred to is an objection to discharge under § 727(a)(3) and (a)(4) of the Bankruptcy Code stated in Count II of the Second Amended Complaint ("Complaint"). Trial was held on July 21, 1998, and post-trial memoranda have been filed. For the reasons which follow we find that the debt is nondischargeable as to Debtor Alberto J. Larrieu. As to Debtor Diane E. Larrieu, his wife, the debt is dischargeable. We also conclude that Debtors are otherwise entitled to a discharge. From the credible evidence at trial, we find the facts as follows.

On or about September 5, 1990, Metrobank of Philadelphia[4], N.A., ("Metrobank") lent Debtors $450,000[5] to purchase a farm for breeding and racing horses. Debtors executed and delivered a Mortgage Note. Under the terms of the Note Debtors were to make principal and interest payments until September 5, 1995,[6] when the outstanding principal, accrued but unpaid interest, and any other sums under the Note were due and payable. There was a penalty for late payment and, upon default, Metrobank could accelerate the debt without notice. In addition to first lien position on the farm, to secure the loan Metrobank also took second position security interests in Debtors' primary residence and their second home.

Beginning in 1993, Debtors sought to refinance the loan and asked Metrobank to remove its liens on their two residences to facilitate the refinance. A balloon payment of $100,000 was coming due in 1995 and Dr. Larrieu felt that he had to restructure the loan or obtain new financing. He knew he had to submit the August 31, 1994, financial statement so that the bank would continue to extend him credit while it considered his request to release its lien. Beginning in late 1993, Debtors' financial planner, Terry J. Siman,[7] wrote to James Smith, Metrobank's then president, asking Metrobank to release its liens. Exhibit 33. In 1994, Mr. Siman wrote to Mr. Smith informing him that Debtors could obtain new financing. Around November of 1994, Plaintiff received Debtors' 1993 tax return and 1994 personal financial statement. This was, in part, in response to Metrobank's demands for information under the terms of a Business Loan Agreement (Exhibit 17) which require annual submissions of financial statements, as well as in support of Debtors' request that Metrobank subordinate its liens on their residences so Debtors could obtain other financing. After

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

2. Debtors' motion to dismiss the amended complaint was denied by Judge Sigmund of this court on or about August 29, 1997, and a motion for summary judgment was denied by the undersigned on or about June 18, 1998.

3. Although captioned "Count I—Section 523 Discharge", § 523 concerns dischargeability of particular debts.

4. Metrobank's name is spelled alternately in the pleadings as "Metro Bank". We refer to "Metrobank" throughout this Memorandum Opinion.

5. The purchase price of the farm was $725,000.

6. The promissory note states a maturity date of September 1, 1995. Exhibit 23. A letter dated September 8, 1995, from the Credit Administrator at Metrobank to Dr. Larrieu states that the loan matured on September 5, 1995. Exhibit 38. Another letter, dated September 14, 1995, from the same person to Dr. Larrieu details principal, interest and late charges from August 1 through September 1. Exhibit 39. By letter dated May 16, 1995, James Smith, then Metrobank's president, informed Dr. Larrieu that the loan "matures and will be payable in full on September 5, 1995." Exhibit 37. Accordingly we use the September 5, 1995, date herein.

7. The parties stipulated that, if called as a witness, Siman would testify that he was Debtors' financial advisor, that Dr. Larrieu authorized him to provide financial information to Plaintiff, and that Dr. Larrieu approved the information that was submitted to Plaintiff. Transcript at 49–50.

receipt of this information, Metrobank agreed to subordinate and Debtors obtained an additional $135,000 from World Bank in early 1995.

Another financial statement dated September 20, 1995, was later provided along with Debtors' 1994 tax return,[8] in support of Debtors' request to extend the due date of September 5, 1995, so that refinancing could be completed. By then, Debtors' financial condition was declining and the balloon payment was owed. Dr. Larrieu asked the bank to consider extending the loan maturity and give him a longer term loan with a lower monthly mortgage payment. He sent a letter dated September 22, 1995, to the bank asking for a restructure, along with the 1995 financial statement. Exhibit 40.

In March of 1996 the Federal Deposit Insurance Corporation ("FDIC") put Metrobank in receivership. In April of 1996 the FDIC endorsed the Mortgage Note to Peoples Thrift Savings Bank ("Plaintiff").[9] Debtors defaulted in March of 1996.[10] In June of 1996 Plaintiff notified Debtors of the default and accelerated the debt. *See* Exhibit 24. Plaintiff confessed judgment against Debtors in July of 1996. Exhibit 25. This bankruptcy case was filed in December of 1996.

Plaintiff asserts that it made three extensions of credit for purposes of § 523(a)(2)(B). Harry S. McElhone, Metrobank's senior vice president charged with overseeing the loan department and later employed by Peoples Thrift, testified for Plaintiff.[11]

*First Extension of Credit*

Mr. McElhone testified that in 1993 the bank was trying to collect current financial data in connection with Debtors' loan, and Debtors' effort to refinance, and to that end pursued Debtors to provide same. At that time the loan was not in default. In November of 1994 Plaintiff finally received Debtors'

financial statement dated August 31, 1994, (Exhibit 10) in response to its requests for current financial data. Mr. McElhone testified that, although the 1994 financial statement showed a net worth of approximately $500,000, Debtors' net worth actually was negative $468,891, a swing of nearly $1 million. Transcript at 120. He stated that if the bank had known of the negative net worth it "could have demanded [payment], could have restructured [the loan]." Transcript at 121.

In its post-trial brief, Plaintiff argues that it extended credit to Debtors in November of 1994 when it did not call the loan upon receipt of the 1994 financial statement and the 1993 tax return. The testimony, however, does not establish that Plaintiff reasonably relied upon the financial statement for this purpose. There was no evidence that Metrobank would not have continued to extend credit if Debtors' true financial status had been known. In fact, a year later when the bank received the 1995 information that showed a significantly worse financial picture, i.e., a negative $49,333 net worth, it nonetheless agreed to an extension of a maturity date, in part because the loan payments were not in default. No evidence was adduced that Plaintiff ever considered a restructure of the loan in 1994 or 1995. Furthermore, testimony established that the loan was not in default at that time, which fact, in conjunction with the other credible evidence, indicates that Plaintiff would not have been completely averse to continuing to extend credit. We find that Plaintiff sought the financial information in an effort to assess Debtors' request to subordinate its liens and for no other purpose. Thus, the credible evidence does not support the contention that the bank extended credit in failing to demand payment or restructure of the loan of its own volition.

---

8. Testimony established that under the loan documents Debtors were required to provide financial statements and copies of tax returns to Metrobank annually and had failed to do so until 1994.

9. In 1998, Peoples Thrift became Bank of Philadelphia. Transcript at 110.

10. Debtors failed to make the monthly mortgage payments for the months of March, April, May and June of 1996.

11. When the FDIC placed Metrobank in receivership on March 8, 1996, Mr. McElhone was employed by the FDIC as an independent contractor. The bank later became Peoples Thrift.

*Second Extension of Credit*

■ In December of 1993, Debtors' financial advisor, Terry Siman, wrote to James Smith, then president of Metrobank, requesting that Metrobank remove its liens on Debtors' two residences so that Debtors could get additional financing from another source. As a result, based on the information contained in the 1993 tax return and 1994 financial statement received by Metrobank in or about November, 1994, Metrobank agreed to subordinate its loan to World Bank for $135,000. We agree that this was an extension of credit. Mr. McElhone testified that Plaintiff would not have agreed to subordinate its lien if the 1994 financial statement and 1993 tax return had been accurate because Debtors had negative net worth and cash flow from the farm and income from Dr. Larrieu's medical practice would not support the annual debt service of $124,000.

*Third Extension of Credit*

■ The third extension of credit allegedly occurred when Plaintiff extended the loan due date of September 5, 1995, pending refinance, at Dr. Larrieu's request. In connection with Dr. Larrieu's request, Plaintiff sought more financial information which Dr. Larrieu submitted in the form of his 1994 tax return and a financial statement dated September 20, 1995. A credit check also was performed in September of 1995. Transcript at 142. Based on this information and that contained in the original loan file, Mr. McElhone recommended a year's extension of the due date of the loan but Plaintiff's board of directors extended it only a few months. We find that this was an extension of credit. Debtors defaulted on the loan six months later, in March of 1996. *See* note 10, *supra.* By letter dated June 25, 1996, Plaintiff notified Debtors of acceleration of the debt. Exhibit 24. In July of 1996, judgment was confessed against Debtors in the amount of $445,335.92. Exhibit 25.

Plaintiff asserts that it was induced not to call the loan, to subordinate its liens on Debtors' residences, and to extend the due date of

the note on the farm by the materially false financial statements and tax returns which Debtors caused to be made with the intent to deceive Plaintiff. Plaintiff avers that it reasonably relied on the documents in thus extending credit. For the reasons which follow we find that Metrobank reasonably relied on materially false financial statements submitted by Dr. Larrieu in subordinating its liens and in extending the due date. Thus, the debt to Plaintiff is nondischargeable as to Dr. Larrieu. However, no evidence was submitted as to Mrs. Larrieu's involvement and the debt is dischargeable as to her. We also find that Debtors are otherwise entitled to a discharge.

**Count I—Section 523**

Count I is an objection to dischargeability of the debt to Plaintiff under § 523(a)(2)(B). That section provides

(a) A discharge under section 727, 1141, ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ...

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

The Second Amended Complaint asserts that the 1994 financial statement significantly overstated the value of Debtors' assets, including the farm and Dr. Larrieu's medical practice, omitted a second mortgage on the farm, and omitted "mounting tax liabilities attributable to inaccurate tax returns." Second Amended Complaint at ¶ 23. Plaintiff alleges that the 1995 financial statement overvalued Dr. Larrieu's annual salary and other assets [12] and listed the second mortgage on the farm incorrectly as a contingent

12. These "other assets" were not identified in the Complaint but were established at trial to include

stock in the farm.

liability. Plaintiff also alleges that Debtors again omitted their increasing tax liabilities. Finally, Plaintiff alleges that both tax returns were materially false because Debtors improperly deducted farm and medical practice expenses. No evidence was adduced to establish improper deductions, however, and we find against Plaintiff on this point.

■ With respect to his income, Dr. Larrieu testified that in 1993 and 1994 his gross income exceeded $300,000. Schedule C of the 1993 tax return, Exhibit 1, shows gross business income of $325,634. Schedule C of Debtors' 1994 tax return (Exhibit 2) shows gross business income of $295,458. Dr. Larrieu testified that in his 1995 financial statement he estimated that his gross income would be the same as in 1994, but that in 1995 his income actually decreased: "it started coming down to 295 and then 225." Transcript at 65. Coupled with the lack of evidence on the falsity of the tax returns, we find no material misrepresentation as to Dr. Larrieu's income in connection with the tax returns.[13] Moreover, no evidence or testimony was produced at trial to show that Dr. Larrieu knew or should have known of the decrease in his 1995 income when he submitted the 1995 financial statement.[14]

■ The assets allegedly overvalued include Dr. Larrieu's medical practice, the farm, and two residences. In the 1994 financial statement, Dr. Larrieu placed a $250,000 value on his medical practice (Exhibit 10) and a $500,000 value on the farm.[15] Id. However, omitted entirely from the 1994 financial statement was a second mortgage on the farm property. The second mortgage in the original amount of $285,000 was acquired in 1990 for a term of two years. Because Dr. Larrieu had never made a payment and the loan bore interest at ten percent per annum, the amount owed was substantially higher than $285,000 when the 1994 financial state-

ment was submitted. Debtors assert that because the mortgage was a matter of public record they were not required to disclose it. This argument is entirely without merit. The purpose of the financial statement was to provide the bank with an accurate picture of Debtors' assets and liabilities in order to facilitate its decision as to how to treat the loan. Annual financial statements also were required under the terms of the loan agreement as a monitoring device so that the bank could assess the continuing status of the loan. Debtors cannot excuse their failure to list a major liability simply because the second mortgage was a matter of public record. Moreover, a financial statement is intended to be a "snapshot" of the financial circumstances of the debtor as of its date. When material assets or liabilities are omitted, the picture is incomplete and inaccurate.

Furthermore, the second mortgage was listed on the 1995 financial statement in the amount of $275,000. The unpaid interest, which was not disclosed, raised the actual amount of the debt to approximately $399,000. In addition, the second mortgage was placed in the column labeled "contingent liability". However, a description of the mortgage as "contested" was handwritten on the financial statement underneath the amount. Mr. McElhone testified that if this mortgage had been properly listed as a current liability that was contested, the loan would have been "under advisement". See Transcript at 128–29, 201. Because the obligation was mischaracterized, Plaintiff did not consider it as a liability when examining the 1995 financial statement. The bank's policy was to consider only current and long-term liabilities which borrowers actually have to repay at that time. In another part of the form, in the column entitled "Contingent Liabilities Estimated Amounts", Dr. Larrieu indicated that there was legal action pending. Mr. McElhone testified that he became aware of

13. Nothing in the record establishes that Mrs. Larrieu had any independent income.

14. Furthermore, no evidence was adduced to show that a decrease in income from $300,000 per year to $225,000 per year would have had an impact on Plaintiff's decision to extend the due date of the loan. The 1995 financial statement shows annual income (salary, bonuses, commis-

sions) of $300,000. Exhibit 11. The 1994 financial statement does not state a figure for income. It lists only assets consisting of the two residences, autos & furnishings, the medical practice, the farm, cash on hand and securities. Exhibit 10.

15. Mr. McElhone testified that in 1990 the farm property was appraised at $625,000.

the litigation when Mr. Smith advised Plaintiff's board of directors about it. Transcript at 184. Mr. McElhone did not remember when this occurred, Transcript at 183, but testified that when the litigation was initiated in February of 1993, he was not aware of it, Transcript at 183–84, and that Mr. Smith was handling Debtors' loan himself. Mr. Smith resigned in October of 1995, Transcript at 135, before the 1995 financial statement and 1994 tax return were submitted. When he saw the "contingent" second mortgage listed, Mr. McElhone looked at the 1993 and 1994 tax returns and saw that Debtors never claimed an interest expense for it. Since the two-year term had matured in 1992, the fact that Debtor claimed no interest expense for the second mortgage in 1993 and 1994 meant that there was no second mortgage accruing interest. Therefore, even though the financial statement listed a second mortgage as "contingent", Debtors had to have paid the 1990 second mortgage or otherwise have satisfied their obligation.

Regarding Debtors' primary residence, Dr. Larrieu testified that the $180,000 value of his house as stated in the bankruptcy schedules differed from that in the 1994 financial statement ($220,000) and the 1995 financial statement ($210,000) because of a market change and because the house needed a roof and a paint job. He also admitted at trial that even the $180,000 was probably "a little much". Transcript at 69. A second residence, valued in the 1994 financial statement at $130,000, and in the 1995 financial statement at $115,000, was listed in the bankruptcy schedules at $92,000 (at which price it was sold). Both houses were appraised by the bank in 1990, the home residence at $225,000 and the second residence at $125,000. Transcript at 156.

Plaintiff complains that other assets (the stock in the farm) valued in the 1995 financial statement at $20,000 were valued at $5,000 in the bankruptcy schedules. Transcript at 188. Dr. Larrieu explained that the farm

owned more horses in 1995 than when he filed his bankruptcy. The stock value was dependent on the value of the horses. In addition, Dr. Larrieu testified that he never obtained an appraisal but he paid $725,000 for the farm, which consisted of 50 acres, a one-half mile race track, paddocks, and a barn. The bank's appraisal (before the loan closed in 1990) showed a value of $625,000. Dr. Larrieu estimated its declining value to be $500,000, due to a general slump in the New Jersey real estate market, on his August, 1994, financial statement. This decline continued, in Dr. Larrieu's opinion, so that the farm value was significantly less by the time he filed bankruptcy. The farm was sold at sheriff's sale in or about October of 1997. This evidence explained the different valuations in the financial statements vis-a-vis the bankruptcy schedules. No other evidence was produced. Therefore, Plaintiff has not met its burden of proving which, if either, stock value was false. Accordingly, the only material representations with respect to which Plaintiff has met its burden concern the existence and amount of the second mortgage and Debtors' net worth in both the 1994 and 1995 financial statements.

■ We find that the 1994 and 1995 financial statements were materially false and caused to be made and published by Dr. Larrieu in an attempt to deceive Plaintiff in order to induce Plaintiff to subordinate its loan so that he could refinance and to induce Plaintiff to refrain from foreclosing while Dr. Larrieu sought other financing, respectively. *See Wolf v. Campbell*, 211 B.R. 14 (E.D.Mich. 1997), *aff'd* 159 F.3d 963 (6th Cir.1998); *In re Robinson*, 192 B.R. 569 (Bankr.N.D.Ala. 1996); *In re Hoffman*, 80 B.R. 924 (Bankr. N.D.Ill.1988). Dr. Larrieu admitted at trial that the 1995 financial statement was submitted in connection with a request for an extension of the maturity date of the loan "[a]nd to get better terms so I could meet my obligations". Transcript at 62–63, 74–75.[16] He

---

**16.** Debtors assert that the financial statements and tax returns were provided in the "ordinary course" and not to obtain an extension of credit. Further, Debtors contend that no extension of credit exists. Defendants' Answer and Affirmative Defenses to the Second Amended Complaint

of Plaintiff Peoples Thrift Savings Bank at ¶ 21. The "ordinary course" is not defined by Debtors and there is no explanation how that would provide justification for including materially false information or failing to disclose significant liabilities in a document Debtors submitted to in-

also testified that the 1994 financial statement was submitted in order to induce Plaintiff to subordinate its liens on Debtors' residences to facilitate Debtors' refinance. The only question remaining is whether Plaintiff's reliance on the financial statements was reasonable. We find that it was, under the standard set forth in *In re Cohn,* 54 F.3d 1108 (3d Cir.1995).

Reasonable reliance is judged by an objective standard. *Id.* at 1117. Three factors are considered: (1) the creditor's standard practices in evaluating credit-worthiness; (2) industry standards or customs in evaluating credit-worthiness; and (3) the circumstances existing at the time of the debtor's application for credit. *Id.* The court held that the intent to deceive can be established by proof of reckless indifference to or disregard of the accuracy of information. *Id.* at 1118–19.

### (1) *Creditor's Standard Practices*

If the creditor follows its usual business practices, reliance is reasonable, absent other circumstances. Mr. McElhone testified that the second mortgage was not listed at all in the 1994 financial statement, thereby omitting a material liability. In the 1995 financial statement, the mortgage was listed as contingent and in the amount of $275,000 when it was actually a current debt in the amount of $399,000. Transcript at 129. Mr. McElhone testified that, under the bank practices, a liability listed as contested would not be added into the debt ratio formula but would simply be a matter for "ad-

visement". Transcript at 201. The second mortgage was not added into the formula for debt ratios because it was listed as contingent and not as a current liability or a current maturity. Transcript at 202. If it had been, the bank "would take it into its equation for getting the debt to worth evaluation." *Id.*[17] Because Dr. Larrieu knowingly and intentionally failed to list the mortgage correctly, the bank's reliance on its collateral position was fraudulently induced.

Mr. McElhone also reviewed a credit report which indicated the fact of the second mortgage and nothing else about it. He testified to the bank's practice of calculating a debt rating. Based on the 1990 property valuations,[18] Debtors' tax returns and financial statements, credit report, and the fact that the loan was not in default when the evaluation was made, Debtors' loan was rated "pass four". This is the lowest level of satisfactory credit and was issued based on Debtors' prior performance "and the collateral position that the bank had." Transcript at 175–76, 200. Had correct information been provided, the loan would have dropped below the "pass four" level and the bank would have undertaken action to secure its collateral or loan performance. Because the bank expected to be repaid when Debtors refinanced, the bank's reliance on its collateral position was reasonable for the period in which it deferred the loan. Mr. McElhone's review acknowledged that income was insufficient to service the debt. Dr. Larrieu's submission of a materially understated sec-

---

duce Plaintiff's reliance. The assertion that there was no extension of credit is without merit.

Debtors also asserted by way of affirmative defense that Plaintiff's claim is barred by the statute of limitations, laches, estoppel and waiver and the statute of frauds. No evidence with respect to the statute of limitations or the statute of frauds was provided and there was no evidence of laches or facts to support an estoppel or waiver theory against the bank.

17. Debtors argue that because Mr. McElhone testified that bank policy did not require examination of contested liabilities in financial statements (Debtors' Response to Plaintiff's Post–Trial Brief, at 9), Plaintiff could not have relied on any misstatements in that section "including the mortgage on" Debtors' farm. This is a misstate-

ment of Mr. McElhone's testimony. The witness testified that contested liabilities are a factor in a loan decision but the second mortgage was listed as a *contingent* liability and, therefore, was not considered in the same way.

18. Mr. McElhone testified that appraisals of the second residence and farm were done in 1990 when the loan was made. The fact of the appraisals was in the original loan write-up. Transcript at 152–53. Although he recommended that new appraisals be performed, he was not aware whether any appraisals were done on Debtors' residence, second residence, or the farm after 1990. Transcript at 152–55. *See also* Transcript at 147–48. He relied on the 1990 values in calculating Debtors' equity in the real estate and to make his recommendation to Plaintiff's board. Transcript at 156–57.

ond mortgage obligation induced the bank's reliance.

In addition, Mr. McElhone prepared a credit scoring sheet to determine a credit risk analysis and knew that Debtors had a satisfactory loan history with no delinquencies. Mr. McElhone's testimony adequately established that the bank had procedures in place to review a loan applicant's financial information, loan information, and credit history and to perform an appropriate risk analysis. The bank acted in conformity with its procedures in its dealings with Debtors.

#### (2) *Industry Standards/Customs*

▮▮▮▮ Under *Cohn,* if industry standards are followed, the investigation of the information provided by the debtor is considered commercially reasonable. No evidence of industry standards was produced. Debtors argue that some practices are "inherent to the industry" in that they are widespread. Debtors also find it "incredible" that no evidence of "what is most likely standard company practice" was offered; to-wit, "a practice of performing a property search before making a loan." Debtors' Response to Plaintiff's Post–Trial Brief at 9. No evidence was offered to establish that a property search is a standard practice in the industry or of this particular lender. Debtors assert that a property search would have revealed the existence and status of the second mortgage and that Plaintiff's objection to dischargeability fails because it did not perform such a search. *See* Debtors' Response to Plaintiff's Post–Trial Brief at 10. However, lenders are not required to investigate every detail of information provided by their borrowers. The reasonableness of a creditor's reliance is objectively determined by considering what "a reasonably cautious person in the same business transaction under similar circumstances" would do. 54 F.3d at 1117. Furthermore, "[i]t is sufficient that the false statement is one that is capable of influenc-

ing, or had a natural tendency to influence, a creditor's decision." *Id.* at 1115. Accordingly, absence of proof of industry practices is not necessarily controlling and we proceed to examine the circumstances at the time the requests for extension of credit were made.[19]

#### (3) *Circumstances at Time of Credit Application*

▮▮▮▮ In determining the totality of the circumstances the following factors may be included:

(1) whether the debtor and the creditor had a business relationship;

(2) whether the creditor conducted a credit check;

(3) whether the creditor examined the debtor's record in meeting his credit card debts;

(4) whether there had been previous dealings with the debtor that produced a relationship of trust;

(5) whether the debt was incurred for personal or commercial reasons;

(6) whether there were any red flags that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate;

(7) whether minimal investigation would have revealed the inaccuracy of the debtor's representation;

(8) whether the debtor and creditor had a personal relationship;

(9) the sophistication of the parties;

(10) whether the creditor or the debtor solicited the extension of credit; and

(11) the length of time of any relationship.

*In re Eckert,* 221 B.R. 40, 45 (Bankr.S.D.Fla. 1998), citing *In re Kahler,* 187 B.R. 508, 514–15 (Bankr.E.D.Va.1995) (footnotes omitted). *In re Eckert* added a twelfth factor, the amount of money involved. 221 B.R. at 45. "The more money there is at stake, the more investigation is required." *Id.*[20] In the in-

---

**19.** Debtors argue that forbearance to exercise rights is not an extension of credit. Judge Sigmund found that it can be. *See* note 2, *supra.* We concur and find that under the circumstances of this case, Plaintiff's forbearance when the loan became due in September of 1995 and its extension of the due date was an extension of credit.

**20.** In *Eckert* the creditor argued that there were no red flags but the court found that the creditor had ignored certain indications that the financial information provided by the debtor was inaccu-

stant matter a significant sum was involved ($450,000) but (1) the parties had a business relationship, (2) Plaintiff conducted a credit report, (3) Debtors were current on their payments, and, although the loan originally was incurred for a commercial purpose (breeding horses), (4) there were no red flags indicating the advisability of further investigation into the matters covered in the credit report, particularly inasmuch as the purpose of the extension of credit, requested by Dr. Larrieu, was to permit refinancing of Plaintiff's debt.

Debtors aver that certain red flags existed: (1) the 1995 financial statement showed no value for the medical practice; (2) the 1995 financial statements showed negative net worth; and (3) the value of the farm had decreased.[21] Mr. McElhone's testimony that the medical practice was overvalued in the 1994 financial statement, Transcript at 178, was not contradicted. Dr. Larrieu testified that he valued it based on the estimated gross receipts from the practice. Transcript at 24. The only explanation offered by Dr. Larrieu to explain his failure to list the medical practice on the 1995 financial statement was "because my medical practice was right then the lowest annual income, 300,000". Transcript at 66. He also testified that "it's just an estimate. Maybe my first six months were better than, you know, the previous year. I don't know." *Id.* at 67. He also testified that he understood the value to be his gross receipts during a year. *Id.* at 24. No explanation was sought or offered for the difference in the valuation in the 1994 financial statement ($250,000) and his testimony at trial. The 1995 financial statement is a preprinted form. The directions include an instruction to "not include assets of doubtful value". *See* Exhibit 11. It also requests

disclosure of checking and savings accounts, cash, securities, real estate, receivables, autos, life insurance cash surrender value, vested interest in deferred compensatory profit-sharing plans, business ventures and other assets. Dr. Larrieu testified that in his medical specialty, cardiothoracic surgery, he does not have a patient base and his business is almost entirely based on referrals from other doctors. *Id.* at 23–24.

We do not find the negative net worth of $49,333 shown on the 1995 financial statement to be significant to an analysis of Plaintiff's obligation to investigate, inasmuch as the due date of the loan was only extended 90 days and only to permit the refinancing of Debtors' loan to be completed, from which Plaintiff would be paid in full. Furthermore, the actual amount of the deficit in Debtors' net worth was $579,333, a fact which Dr. Larrieu did not disclose.

Debtors assert that the bank did not reasonably rely on the documentation because James Smith was aware of Debtors' financial difficulties, knew of the litigation concerning the second mortgage, and initiated the loan. Transcript at 135, 59. This argument is not persuasive. Mr. Smith was not called to testify and what Mr. Smith did or did not do or know is not in evidence. There was no testimony or evidence that Mr. McElhone, the only witness besides Dr. Larrieu, knew of the alleged communications between Dr. Larrieu and Mr. Smith, participated in them or in any part of the loan transactions except to review the documentation with respect to the extensions of credit at issue herein. Furthermore, there was no evidence that Mr. Smith had a hand in any of the decisions with respect to the forbearance to foreclose or the decision to subordinate Plaintiff's lien on

---

rate. In the matter before us Debtors argue that Plaintiff knew of the litigation involving the second mortgage but extended the term of the loan and subordinated its lien anyway. We reiterate that Dr. Larrieu's testimony established that Mr. Smith was aware of the litigation and that Mr. McElhone became aware of it later. However, there was no testimony that Mr. McElhone knew that the second mortgage was contested and material rather than contingent as stated on the 1995 financial statement. More important, the second mortgage was not disclosed on the 1994 financial statement and the amount listed on the

1995 financial statement was significantly understated. Mr. McElhone, in reviewing Debtors' loan, had no reason to believe that any material issue involving the second mortgage would affect the bank's secured position or its decision regarding Debtors' requests.

**21.** Debtors argue that such a red flag existed in their failure to file financial statements between 1990 and 1994. This is a non-issue inasmuch as Debtors were current on their payments during that period (and beyond).

Debtors' residence so that Debtors could refinance. In fact, Plaintiff's board of directors made the decision regarding subordination of its loan based on Mr. McElhone's recommendations. Transcript at 197–98. It was Mr. McElhone's responsibility to examine the circumstances and make a recommendation to Plaintiff's board of directors. The board chose to extend the loan for a shorter period of time than recommended by Mr. McElhone and the only purpose of the extension was to allow Dr. Larrieu to obtain new financing.[22] The board and Mr. McElhone relied on the false financial statements which reflected a value of Debtors' collateral greater than that which actually existed in light of the undisclosed nature and amount of debt.

In *In re Mowji,* 224 B.R. 221, 227 (Bankr. M.D.Fla.1998), the court identified four factors indicating reliance that would not be reasonable:

(1) the creditor having knowledge that the financial information is not accurate; (2) the statement containing obviously inaccurate financial information; (3) the creditor's investigation of the statement suggesting its falsity or incompleteness; and (4) the creditor failing to verify the information on the statement.

224 B.R. at 227, citing *In re Duncan,* 35 B.R. 323 (Bankr.W.D.Ky.1983).

▮▮▮▮▮ A debtor cannot "rely on minor clues of falsity in financial statements that on the whole have the appearance of being very complete and reliable", at least where the creditor took reasonable steps to inquire as to the debtor's creditworthiness. *In re Gosney,* 205 B.R. 418, 421 (9th Cir. BAP 1996), *aff'd* 161 F.3d 12, 1998 WL 546962 (9th Cir., Aug. 28, 1998) (TABLE, Text in Westlaw), citing *In re Siriani,* 967 F.2d 302 (9th Cir. 1992). In the matter before us, Plaintiff had run a credit report and received at least one financial statement (1994) prepared by Debtors' financial advisor, Terry Siman. With respect to the materiality of the misrepresentations, it is sufficient that the false statement "is capable of influencing, or had a

natural tendency to influence, a creditor's decision." 54 F.3d at 1115. The circumstances establish reasonable reliance by Plaintiff on the materially false financial statements provided by Dr. Larrieu.[23]

▮▮▮▮ With respect to Debtors' assertion that Plaintiff should have investigated the second mortgage, we note that a creditor is not necessarily required to make an independent investigation of the information contained in a financial statement in order to meet the reasonable reliance requirement. *See In re Sansom,* 224 B.R. 49, 56 (Bankr. M.D.Tenn.1998). In *Sansom,* unlike the matter before us, the bank lent money before it received the financial statement and did not investigate financial information supplied by the debtor after the loan was made. Here, Plaintiff obtained tax returns and a credit report and Debtors were current on their payments until after the extensions at issue herein were granted.

*In re Mowji, supra,* further stated:

We do not believe it was Congress' policy in enacting § 523(a)(2)(B) to provide for nondischargeability only in instances of the most sophisticated form of deception. Rather, we believe that the intention of the statute, read in conjunction with the cases interpreting it, to permit a finding of reasonable reliance where there is no major default in any of the areas set out in *Duncan.*

224 B.R. at 227 citing *In re Duncan, supra.*

### Count II—Section 727

In addition to the above nondisclosures and/or misrepresentations, Plaintiff requests that a discharge be denied pursuant to § 727(a)(3) and (a)(4). With respect to subsection (a)(3), the Complaint is based on Debtors' failure "to produce ... true, accurate and complete business records, and/or the undervaluing of the assets disclosed." Second Amended Complaint ¶ 34. Section 727(a)(3) provides that "[t]he court shall" deny a discharge if

---

22. Mr. McElhone recommended that the loan be extended for a year. Transcript at 166. The board approved an extension of only a few months.

23. The 1994 financial statement was not signed. The 1995 financial statement was signed only by Dr. Larrieu. *See* Exhibits 10 and 11, respectively.

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case. . . .

Subsection (a)(4) of § 727 provides that the "[t]he court shall" deny a discharge if

the debtor knowingly and fraudulently, or in connection with the case

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs

With respect to § 727(a)(4), Plaintiff relies on Debtors' Amended Schedules, which were filed in response to Plaintiff's objections to exemptions.[24] The Amended schedules revealed previously undisclosed "financial accounts" worth more than $12,000 (Exhibit 50, Part B, January 14, 1997, bank statement and supporting documents; *see* Transcript at 105), accounts receivable of $2,311 previously listed at zero (Exhibit 15), and household goods and apparel previously listed as having a value of $1,400 as having a value of $2,375, citing § 723(a)(3) and (a)(4). In addition, Schedule C of Debtors' 1996 tax return (Exhibit 4) was admitted for the purpose of establishing that no assets of the medical practice were disclosed. Concerning the medical practice, there was no evidence adduced that the practice had assets. Dr. Larrieu's testimony that the practice owned no substantial property and the business itself has little transferrable value due to the nature of his patients was not refuted. Plain-

tiff's nondisclosure arguments are rejected on this point.

Plaintiff asserts, nonetheless, that discharge should be denied because (1) Debtors failed to produce accurate and complete business records, and (2) undervalued the assets disclosed in the Schedules and Statements. The purpose of § 727(a)(3) is "to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge. . . . The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir.1992). There was no evidence that Debtors failed to supply any requested information in connection with the case or that they concealed, falsified, failed to produce, etc., records in connection with the case. The false financial statements and the tax returns were submitted to Plaintiff prepetition and affect only the dischargeability of the debt to Plaintiff, under the particular circumstances of this case. The inaccuracies in the original Schedules and Statements of Affairs fall under § 727(a)(4) and that discussion follows.

Plaintiff relies on § 727(a)(4) which provides for denial of discharge if the debtor "knowingly and fraudulently, or in connection with the case . . . made a false oath or account". In support of these allegations Plaintiff points to Debtors' Amended Schedules filed in response to objections to exemptions. The amended schedules included previously undisclosed assets or different valuations as detailed, *supra.*

Plaintiff asserts that the draft schedules created in August of 1996 and the schedules actually filed with and after the bankruptcy petition date of December 24, 1996, show the same amounts for various assets and liabilities (e.g., checking and savings accounts, credit card and line of credit debt) and that therefore the bankruptcy schedules were materially false indicating a reckless disregard for their accuracy which is suffi-

---

24. The trustee also filed objections to certain exemptions.

cient to base a denial of discharge.[25] In their response to Plaintiff's post-trial brief, Debtors excuse these omissions, citing Dr. Larrieu's testimony that he did not personally do the billing for his medical practice. This fact does not excuse his failure to ascertain and disclose the amount of outstanding accounts receivable;[26] debtors are required to disclose all assets of whatever nature and Dr. Larrieu failed to do so. However, Dr. Larrieu's explanation at trial is accepted as credible and the record does not establish the requisite intent to deceive.

Plaintiff also cites Dr. Larrieu's failure to list accounts receivable in his schedules. The schedules list the accounts at "zero". The amended schedules list approximately $2,300. Exhibit 50B is comprised of bank statements for various months. That portion of it covering the January 14, 1997, statement was admitted with respect to the accounts receivable issue. Also admitted were the cancelled checks attendant to that statement. This bank statement shows deposits of over $12,000 made from December 27, 1996, three days after the bankruptcy was filed, to January 8, 1997. Dr. Larrieu testified that these represent payments to him by various entities indebted to him for medical services. Some of the $12,000 was collected from prepetition balances owed to Dr. Larrieu. However, as stated above, Plaintiff did not establish to a preponderance that Dr. Larrieu intended to defraud anyone in failing to list these amounts.

■ Plaintiff also points to an increase in the value of household goods in the Amended Schedules in the amount of $900. This amount is not material. Plaintiff argues

that Debtors' amendment of their exemptions only after Plaintiff and the trustee objected to them is evidence upon which to base a denial of discharge. Debtors are permitted to amend exemptions at any time until the case is closed. Fed.R.Bankr.P. 1009. Nothing in the record supports denial of discharge because exemptions were amended.

■ Furthermore, in order to sustain an objection to discharge the false oath must be made knowingly and fraudulently and must be material to the course of the bankruptcy case. *Chusid v. First National Bank,* 1998 WL 42292 (E.D.Pa.1998). A false oath in the debtor's schedules can qualify. *Id.* Plaintiff contends that Debtors' conduct evidences the "extreme carelessness" referenced in *Scimeca v. Umanoff,* 169 B.R. 536 (D.N.J.1993), *aff'd* 30 F.3d 1488 (3d Cir.1994) (TABLE), as a basis for denial of discharge under § 727(a)(4)(A). Plaintiff asserts that the amended schedules were substantially different from the schedules originally filed in the case, indicating that Debtors had "a clear lack of concern for their accuracy and completeness." Although we agree with the statement of the law, we do not find the failure to disclose in this case sufficiently negligent or material to deny Debtors a discharge.[27]

Plaintiff also challenges the failure to list a Keogh plan and annuities in the schedules. Dr. Larrieu testified that he thought the assets (IRAs that he believed were part of his Keogh) were exempt and, until his attorney so informed him, he was not aware that these assets were "supposedly not exempted." Transcript at 213. He voluntarily amended the schedules when he learned of his error. We note that all assets must be

**25.** Exhibit 13, draft bankruptcy schedules prepared in or about August, 1996, was admitted for the limited purpose of illustrating the changes in Debtors' financial situation between the August draft and the date the schedules were actually filed in December of 1996. Plaintiff asserts that there were "no changes" in the draft and actual schedules and that the amounts "could not possibly have remained identical." Transcript at 101. In Plaintiff's opinion, this illustrated the carelessness with which Debtor prepared their schedules. Dr. Larrieu testified that his credit card debt increased between August and December due to nonpayment but the increases were due to accrual of interest. There was no evidence that new charges were made.

**26.** Debtors argue that the amounts owed to the medical practice do not constitute "accounts receivable". Regardless of the terminology used to describe them, the amounts were owed to Dr. Larrieu and, therefore, were an asset of this estate and were not disclosed.

**27.** There was testimony that Dr. Larrieu agreed to pay the trustee $25,000 for distribution to unsecured creditors when issues about his failure to disclose all assets arose. All parties agreed that this was a settlement derived after the trustee obtained appraisals of various assets.

listed in bankruptcy schedules, regardless of a debtor's or his attorney's opinion as to their exemptibility. The status of the assets is a legal determination to be made by the court when the issue is before it. Having said this, we accept Dr. Larrieu's testimony that his nondisclosure was not done with the intent to defraud and we conclude that the evidence on this point is insufficient to support denial of the discharge.

### Dischargeability of the debt as to Mrs. Larrieu

In its post-trial brief, Plaintiff bases its objection to dischargeability and discharge with respect to Mrs. Larrieu solely on (1) her signature on certain documents, including a letter to a bank official authorizing him to discuss "personal and business banking affairs" with Siman (Exhibit 43), the bankruptcy petition, Schedule of Assets and Liabilities and Statement of Financial Affairs (Exhibit 14) filed in this case, the promissory note (Exhibits 22, 23), the mortgage (Exhibits 18, 19), the business loan agreement (Exhibit 17), (2) any benefit she received, and (3) her failure to appear at trial. The only evidence adduced at trial concerning Mrs. Larrieu was the existence of her signature on the documents, including a letter signed by Dr. and Mrs. Larrieu authorizing the bank to discuss their affairs with Siman, and her absence from the trial. Mrs. Larrieu did not sign either the 1994 or 1995 financial statement. Furthermore, most correspondence concerning the loan was directed to Dr. Larrieu alone or signed only by him.

Plaintiff notes that the 1994 and 1995 financial statements were submitted on Mrs. Larrieu's behalf as well as Dr. Larrieu's. Plaintiff argues that because Mrs. Larrieu benefitted when the loan was not called, and because she helped prepare and signed the schedules and the Statement of Financial Affairs and the Amended Schedules filed in this case and failed to appear, her intent to deceive required under § 523(a)(2)(B) and § 727(a)(4) has been established. Plaintiff contends that this evidence proves her "reckless indifference to, or reckless disregard of, the accuracy of the information in the 1994 and 1995" financial statements. Plaintiff's argument fails, however, for lack of proven facts. There was no evidence that Mrs. Larrieu assisted in preparing the Schedules or financial statements or that she had knowledge of Dr. Larrieu's accounts receivable or billings or the valuation of property. Indeed, there was no evidence of any role played by Mrs. Larrieu whatsoever.

■ Although there is a presumption under Pennsylvania law that one spouse has the authority to act for both and the presumption can establish liability under the principles of agency law, *see, e.g., In re Paolino*, 75 B.R. 641 (Bankr.E.D.Pa.1987), in light of the lack of any other evidence against her, we cannot deny Mrs. Larrieu a discharge or find that the obligation to Plaintiff is nondischargeable as to her. A discharge is personal as to each debtor and the elements of § 523 (dischargeability) and § 727 (discharge) must be substantiated as to each debtor. Plaintiff must establish Mrs. Larrieu's intent to deceive to prove nondischargeability and that she knowingly and fraudulently made a false oath to deny her discharge. Neither burden was met.

■ With respect to her failure to appear at trial, we note that *intentional* failure to appear may be a basis upon which to deny discharge in some circumstances. *In re Robson*, 154 B.R. 536 (Bankr.E.D.Ark.1993). The only evidence with respect to Mrs. Larrieu's failure to appear was the fact of her absence from trial. Although Mrs. Larrieu filed a change of address with the Post Office two weeks before the trial and the information was not provided to Plaintiff, *see* Plaintiff's Post–Trial Reply Brief at 5, n. 4, there was no evidence as to when she left the jurisdiction. Plaintiff concedes that it never subpoenaed Mrs. Larrieu and produced no witness who had any dealings with her in connection with the extensions of credit at issue. In *Robson*, the debtors had failed to appear on a complaint objecting to discharge and dischargeability despite having been specifically directed by the court in two separate orders dated November 18, 1992, and an order dated February 8, 1993. *Robson*, 154 B.R. at 539. In *Robson*, notwithstanding the debtors' failure to appear, the court still weighed the detriment to the proceedings and the dignity of the court against the potential harm to the debtor upon denial of discharge. *Id.* at 539, citing *In re Kokoszka*, 479 F.2d 990 (2d Cir.1973), *aff'd* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). The

court found that the debtors knowingly and fraudulently withheld information by failing to appear and by fleeing the district with the information. Accordingly, the court denied their discharge. The situation in *Robson* is not equivalent to that before us where there is no such evidence with respect to Mrs. Larrieu. The simple fact that she was not at trial is insufficient under § 727(a)(3) or (4), in and of itself, to deny her a discharge or to hold that her obligation to Plaintiff nondischargeable under § 523(a)(2)(B).